United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1036

_____

| | | |
|---|---|---|
| Donna J. Davis, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| John J. Callahan,[1] Acting Commissioner | * | |
| of Social Security, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  June 12, 1997

Filed:   September 24, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, BEEZER,[2] and WOLLMAN, Circuit
     Judges.

_____

_____

[1]John J. Callahan was named to serve as Acting Commissioner of Social Security
effective March 1, 1997.  He has been substituted for Shirley S. Chater pursuant to Fed.
R. App. P. 43(c).

[2]The HONORABLE ROBERT R. BEEZER, United States Circuit Judge for the
Ninth Circuit, sitting by designation.

WOLLMAN, Circuit Judge.

Donna Davis appeals from the district court's order affirming the Commissioner's denial of her application for Disability Insurance Benefits. We reverse and remand.

**I.**

Davis was thirty-three years old at the time she applied for benefits. She has her general equivalency degree and has employment experience as an order entry clerk, secretary, cashier, and assembly line worker.

Davis filed for benefits on May 20, 1993, claiming that she became disabled as the result of a fall at work on August 18, 1992, which exacerbated pain stemming from the spinal fracture she had sustained in a car accident some fifteen years earlier. At the hearing before the administrative law judge (ALJ), held on May 13, 1994, Davis testified that soon after the fall she began experiencing severe pain in her neck and upper back and continued to be in severe pain for the next few weeks. In addition to the pain in her neck and back, Davis found it painful to breathe. Also, her leg shook, making it difficult for her to control her walking. In an attempt to relieve her pain, Davis underwent surgery to remove the Harrington rods[3] that had been inserted into her back to repair her spinal fracture. Davis testified that following that surgery the pressure in her lower back worsened, her legs began to shake severely all the time, her knees began to lock up, and her feet "quit working." In addition, she testified that she experiences severe migraine headaches and numbness in her legs.

---

[3]Harrington rods are "a system of metal hooks and rods inserted surgically in the posterior elements of the spine to provide distraction and compression in treatment of scoliosis and other deformities." The Sloan-Dorland Annotated Medical-Legal Dictionary, p. 305 (1992 Supplement).

The ALJ discredited Davis's subjective complaints of disabling pain and found that although Davis suffered from a severe impairment, the medical evidence did not indicate an impairment of sufficient severity to meet a listed impairment. The ALJ concluded that Davis was restricted in her ability to perform heavy manual labor or work requiring frequent stooping or working in a bent-over position for prolonged periods of time, restrictions which would not preclude her from performing her past relevant work.

On appeal, Davis argues that the Commissioner's decision is not supported by substantial evidence because it was based on the ALJ's erroneous determination that Davis's subjective complaints were not credible.

**II.**

We must affirm the Commissioner's decision denying benefits if substantial evidence on the record as a whole exists. See Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Id. (citations omitted). In determining whether substantial evidence exists, "we must consider both evidence that supports and evidence that detracts from the [Commissioner's] decision, but we may not reverse merely because substantial evidence exists for the opposite decision." Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (citation omitted). "An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996). The ALJ must consider the claimant's prior work history; daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. See id. (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).

The ALJ discredited Davis's subjective complaints of pain, finding them to be contradicted by medical evidence. He found that Davis's "pain has not caused her to see a physician often and she has not been prescribed medication in such dosage or quantity so as to indicate severe disabling pain. There is no indication that she does not do her own household chores and other activities."

The ALJ based his determination that medical evidence contradicted Davis's complaints in large part on the report of Dr. Leventhal, an orthopedic specialist. Dr. Leventhal noted that he was at a loss to explain all of Davis's complaints, concluded that "her problem is complex and multifactorial," and surmised that Davis had a considerable amount of symptom magnification with functional overlay. There is significant medical evidence, however, that supports Davis's complaints of disabling pain, including Dr. Leventhal's own findings. Dr. Leventhal's examination of Davis revealed that Davis had marked limitation of forward bending and extension, restricted right and left lateral bending, moderate spasticity of her lower extremities with hyperreflexia in her knees and ankles, and sustained clonus[4] of both lower extremities. Dr. Leventhal noted that Davis walked with a spastic gait, had a difficult time walking on her heels and toes, and that she complained bitterly of pain. He recommended a check for infection, an MRI of her thoracic and lumbar spine, and consideration of a Baclofen pump[5] to help with her spasticity. He referred her to Dr. Feler, a neurosurgeon, for consultation about an implantable Baclofen pump. Davis was subsequently unable to complete the MRI due to extreme claustrophobia.

---

[4]Clonus is "alternate muscular contraction and relaxation in rapid succession." The Sloan-Dorland Annotated Medical-Legal Dictionary, p. 149 (1987).

[5]Baclofen (Lioresal) "is useful for the alleviation of signs and symptoms of spasticity resulting from multiple sclerosis, particularly for the relief of flexor spasms and concomitant pain, clonus, and muscular rigidity." Physician's Desk Reference, p. 829 (50th ed. 1996). A Baclofen pump is recommended for chronic use of Baclofen injection, which "is indicated for use in the management of severe spasticity of spinal cord origin." Id. at 1596.

The findings of several other physicians likewise rebut the ALJ's conclusion that the medical evidence contradicted Davis's complaints of pain, and they also contradict the ALJ's finding that Davis sought medical attention infrequently and was not prescribed medications in such dosage or quantity to support her allegations of pain. Immediately following her fall, Davis went to her family physician, Dr. Mitchell, who determined that Davis suffered muscle strain to her trapezius and mild contusion to her left hand and prescribed Dolobid and Parafon DSC[6] for pain. The following day Davis saw an emergency room physician, Dr. Page, who also diagnosed trapezius strain and prescribed Tylenol #3 for Davis's pain and recommended that she not work the next day. The following day, August 20, 1992, Davis returned to Dr. Mitchell, complaining of pain in her neck and nausea and vomiting. Dr. Mitchell recommended that she not work for another four days, continued her on the Parafon DSC, and prescribed Darvocet N-100[7] for her pain.

On August 24, Davis saw Dr. Shedd, a physician whom she previously had seen for back-related problems. Dr. Shedd prescribed Percodan,[8] and instructed Davis not to work for one week. On August 28, Davis returned to Dr. Mitchell, who continued Davis on Parafon DSC and Darvocet N-100 and additionally prescribed Clinoril.[9] Davis had a follow-up visit with Dr. Mitchell on September 3, and was continued on

---

[6]"Dolobid is indicated for acute or long-term use for symptomatic treatment of . . . [m]ild to moderate pain." Id. at 1655. Parafon DSC is "indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions." Id. at 1581.

[7]Darvocet N-100 is indicated for the relief of mild to moderate pain. Id. at 1434.

[8]Percodan is indicated for the relief of moderate to moderately severe pain. Id. at 939.

[9]Clinoril is indicated for acute or long-term use in the relief of signs and symptoms of a number of types of arthritis and acute painful shoulder injuries. Id. at 1619.

the previously-prescribed medications and continued leave from work. Davis saw Dr. Mitchell again on September 10 and September 17, and was referred to Dr. Thompson, an orthopedic surgeon, whom she saw on September 18, for evaluation of the rods in her back. Dr. Thompson found that Davis had full, albeit painful, motion of her cervical spine, difficulty in toe and heel walking, and some atrophy of the left quadricep, and that her reflexes were hyperactive with an unsustained clonus at both ankles and several beats at the knees.

Upon referral by Dr. Thompson, Davis saw Dr. Gibson, a neurologist, on November 3, 1992. Dr. Gibson noted tenderness over Davis's left Harrington rod. In addition, he found her gait and legs were spastic and that she had unsustained clonus at the knees and ankles with crossed adductors. He also noted that she had decreased pinprick sensation in the lateral aspect of the right leg and thigh. Dr. Gibson stated that Davis had been developing increased spasticity since her fall and "there is certainly no doubt that on examination today she is quite spastic with signs suggesting a problem in the thoracic cord." Dr. Gibson prescribed Lioresal (Baclofen) for the spasticity in Davis's legs and recommended either a CT scan or myelogram.

Davis was next referred to Dr. Reding, a neurosurgeon, who upon examining Davis was doubtful that she had suffered a significant additional neurologic injury but who also recommended that Davis have a myelogram, which she subsequently underwent on November 30. The myelogram revealed that Davis had a mild narrowing of the anterior aspect of the canal at the T11-12 level secondary to posterior osteophyte formation and evidence of a mild disc bulge, with small posterior osteophytes at the T5-6 level. Based on these findings, Dr. Reding concluded that the neurologic findings regarding Davis's legs related to her previous injury and suspected that her leg symptoms were associated with the pain in her spine. Dr. Reding then suggested that Davis might want to proceed with removal of the Harrington rods in hopes of obtaining some pain relief. A tomogram of T11-12 on January 7, 1993, showed minimal anterior wedging of T12, associated with mild degenerative change at the T11-12 end plate.

On February 5, 1993, Davis was admitted to the hospital for removal of the Harrington rods. Dr. Thompson, who performed surgery to remove the rods, indicated that prior to surgery Davis had weakness in her right quadricep, spasticity of both lower extremities, unsustained prominence at the knees and ankles, extensive plantar response bilaterally, and decreased sensation in the lateral aspect of her right leg.

Davis was next seen by Dr. Shedd on May 4, 1993, and was again observed having weak heel and toe walking, to the point that she had to hold on to the examining table. In addition, Dr. Shedd noted that Davis walked with her knees locked and that she had very hyperactive reflexes bilaterally, dyscoordination with the heel-knee-ankle test, and unsustained myoclonus in both ankles. Dr. Shedd prescribed Lioresal and referred her to Dr. Leventhal, the orthopedic specialist whose findings are set forth above.

On May 27, 1993, Davis again saw Dr. Shedd, who found she had paraspinuous lumbar muscle spasm and was severely limited in movement in any direction, and prescribed additional Baclofen. Davis was next seen by Dr. Feler on August 31, 1993. Dr. Feler's examination revealed cold allodynia and hyperthia, sustained clonus bilaterally, bilateral Babinski's signs,[10] spasticity of her lower extremities, and occasional spontaneous spasms, and noted that Davis had difficulty ambulating and that the range of motion in her hips was mildly limited. Dr. Feler concluded that in addition to her previous spinal cord injury, Davis had neural injury pain in the lower extremities, facet syndrome and intractable spasticity and lower extremity spasm, and prescribed Tegretol and Daypro,[11] in addition to Baclofen.

---

[10]Babinski's sign is "the extension of the great toe with fanning of the other toes," and "is of spinal origin and attests to an upper motor neuron lesion." The Merck Manual, p. 1384 (16th ed. 1992).

[11]"Daypro is indicated for acute and long-term use in the management of the signs and symptoms of osteoarthritis and rheumatoid arthritis." Physician's Desk Reference at 2426. Tegretol is indicated for use as an anticonvulsant and in the treatment of pain associated with trigeminal neuralgia (a disorder of the trigeminal

Davis returned to Dr. Feler on October 5, 1993, complaining that the Tegretol was making her feel "high." Dr. Feler adjusted her prescription accordingly. On November 16, 1993, Davis underwent a CAT scan of her lumbar spine, which revealed mild bilateral foraminal narrowing secondary to hypertrophic changes, in addition to degenerative changes in the facet joints.

Davis testified that although at the time of her hearing she was taking six prescription medications, they did not completely relieve her symptoms. She stated that "it doesn't take the pain away and it doesn't take the shaking away. It takes the edge off of it, to where I can actually deal with the pain . . . it helps me not be in so much pain."

The ALJ's finding that Davis's subjective complaints of pain were contradicted by the level of her daily activities is likewise without support in the record. The ALJ stated, "there is no indication that [Davis] does not do her own household chores and other activities. She enjoys reading, watching television, needlepoint, and visiting. She is able to drive." Uncontroverted testimony reflects, however, that Davis is not able to perform many of her daily activities, and the fact that Davis could perform a few light household chores does not constitute substantial evidence that Davis possessed the functional capacity to perform her past relevant work. See Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996) ("We have repeatedly held . . . that the 'ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'") (citation omitted).

---

nerve producing bouts of severe, lancinating pain lasting seconds to minutes in the distribution of one or more of its sensory divisions, The Merck Manual at 1509). Tegretol "should not be used for the relief of trivial aches and pains." Physician's Desk Reference at 852.

Davis testified that during a twenty-four hour period she has to lie down about twelve hours. She stated that she has tried to do laundry and to vacuum her floor, but that "it hurts so much that by the end of the day, I'm in so much pain that it's not worth it. So I either have to take more medication, to make it through it, or not do it." She also testified that someone else cooks the majority of her family's meals and takes her grocery shopping, and that she cannot clean the bathtub or mop floors. She stated that she has tried to find things to do around the house, but hasn't found a lot that she can do, and can only do "just really the basic, the easiest things around the home." In addition, Davis testified that she occasionally drives twelve miles to take her husband to work and home again, a total driving time of only some two hours per week.

Davis's husband testified that Davis's condition has been worsening since her fall, that even when Davis does little things, she pays for it, and that it doesn't take much to make her sore. He also testified that he must often assist her in walking and that Davis does not sleep well at night because of the spasms. A friend of Davis's who sees her nearly every day testified that since Davis's injury and surgery to remove the Harrington rods she has had a lot of pain in her back and bad headaches and that her knees lock up, causing her to fall. This witness testified that Davis is very limited in her activities and that she takes care of Davis and does most of Davis's cooking.

Another friend testified that she has noticed a "tremendous difference in [Davis] and in the abilities that she had" since her fall and that she has seen a drastic difference in Davis's mobility since the removal of her Harrington rods. Hyde testified that it was a major effort for Davis to climb the three steps to Hyde's door, and for her to get up out of a chair and walk the few steps to the door. Hyde also stated that she has heard Davis "moan and groan" when moving around in a chair.

Although it was for the ALJ as trier of fact to give the testimony of family members and friends such credence as he deemed warranted, he was not free to find

that Davis had offered no evidence in support of her allegations regarding her daily activities.

Because we conclude that the ALJ failed to conduct such a review, we reverse and remand for consideration of Davis's subjective complaints of pain in accordance with the factors set forth in Polaski v. Heckler in light of all of the evidence in the record. See Ingram v. Chater, 107 F.3d 598, 605 (8th Cir. 1997).

The judgment is reversed, and the case is remanded to the district court with directions to remand it to the Commissioner for further proceedings consistent with the views set forth in this opinion.

BEEZER, Circuit Judge, dissenting.

I respectfully dissent.

Davis argues that the district court erred in affirming the Commissioner's decision to deny benefits. Davis maintains that substantial evidence does not support the ALJ's finding that her "allegations [of pain] are not credible to the extent alleged."

A plethora of physicians have examined and treated Davis. These experts reached conflicting conclusions regarding Davis's pain, disability and residual functioning capacity. One examining physician concluded that Davis was totally disabled. On the other hand, Dr. Leventhal stated that Davis's pain was "out of proportion to all of her physical findings."

Although unable to perform some work after her 1975 accident, Davis had been employed in a number of different capacities prior to her 1992 fall. Three neurologists that examined Davis determined that the injuries she sustained before the 1992 fall

were the likely cause of her discomfort. They made no conclusions respecting whether Davis was totally disabled.

The ALJ considered Davis's testimony, testimony offered by Davis's family and friends, and the range of medical opinions introduced into evidence. "We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict." Richardson v. Perales, 402 U.S. 389, 399 (1971). Although the ALJ acknowledged that Davis suffered pain, he found that Davis's allegations were not credible to the extent she alleged.

Substantial evidence supports the ALJ's findings. I would affirm the decision of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-