# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1858

_____

Mary J. O'Donnell,         *
        *
        Appellant,         *
        *    Appeal from the United states
        v.         *    District Court for the
        *    Western District of Missouri
JoAnne B. Barnhart, Commissioner    *
of Social Security,         *
        *
        Appellee.         *

_____

Submitted: November 8, 2002

Filed: February 7, 2003
_____

Before McMILLIAN and MELLOY, Circuit Judges, and FRANK,[1] District Judge.
_____

McMILLIAN, Circuit Judge.

Mary J. O'Donnell appeals from a judgment of the district court affirming a final decision of the Commissioner of Social Security denying her social security disability and supplemental security income benefits. We reverse and remand for further proceedings.

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota, sitting by designation.

**BACKGROUND**

O'Donnell was born in 1955 and has a high school education. From 1981 to July 1995, with the exception of one year, she worked as a computer repair technician, earning over $50,000 in 1993. In May 1996, she filed an application for disability insurance and supplemental security income benefits, alleging a disability beginning on July 21, 1995. On that date, she was involved in an automobile accident. Emergency room X-ray and MRI examinations showed no fractures or dislocations, but revealed mild degeneration of the cervical spine, disc protrusion and bulging, and stenosis. The emergency room physician discharged her, prescribing rest, a cervical collar, and medications.

Following the accident, O'Donnell complained of pain, headaches, and photophobia (an abnormal intolerance of light), and saw a number of doctors. In August 1995, O'Donnell saw Dr. Arnold Schoolman, a neurosurgeon. Despite her complaints, the neurological exam was normal. The doctor diagnosed a mild cerebral concussion, neck and spine injuries, and carpal tunnel disease and prescribed physical therapy. O'Donnell attended several therapy sessions and had trigger point injections and epidural nerve blocks. In February 1996, Dr. Schoolman opined that O'Donnell's pain had an emotional overlay. In March 1996, she was hospitalized overnight for a probable adverse reaction to Zoloft, an anti-depressant.

In September 1995, O'Donnell saw Dr. Ian Belson, an osteopath, who suggested that her complaints were out of proportion to her injury and might have had a psychogenic overlay. Dr. Belson recommended a comprehensive pain management approach. In November 1995, O'Donnell saw Dr. Robert Takacs, who was associated with a spine clinic. Dr Takacs diagnosed chronic cervical strain with bulging discs and post-concussion syndrome and suggested that O'Donnell was magnifying her

symptoms. He referred her to Dr. Melvin Karges, a physiatrist.[2] In November 1995, Dr. Karges diagnosed cervical strain and referred her to Dr. Bernard Abrams, a neurologist.

From December 1995 through April 2000, O'Donnell was treated by Dr. Abrams. The doctor's treatment notes show over 50 office visits and telephone calls for O'Donnell's complaints of pain in her back, legs, shoulders, hands, severe headaches, and photophobia. Among other things, Dr. Abrams prescribed pain medications, including Tylox, Skelaxin, and OxyContin. In February 1996, Dr. Abrams discussed with O'Donnell the possibility that her condition might be psychogenic in origin. In July 1996, he recommended an antidepressant, which she refused to take because of her previous adverse reaction to Zoloft. Dr. Abrams also referred O'Donnell to a pain and headache clinic, where she received physical therapy, cervical epidural nerve blocks, and trigger point injections. In October 1996, Dr. Abrams wrote that O'Donnell was suffering from the effects of the car accident, including severe photophobia, and neck and shoulder pain, and that she could not return to work.

In March 1997, Dr. Abrams referred O'Donnell to the Mayo Clinic. She traveled by airplane from Kansas City, Missouri, to Rochester, Minnesota. From March 19 to her discharge on April 2, 1997, O'Donnell had numerous evaluations for her complaints of severe headaches; face, neck, and back pain; dizziness; photophobia; left leg and arm weakness, pain, and numbness; hoarseness; and ringing in her ears. Dr. Sherwin Goldman, who was with the Mayo Impairment Evaluation Center, noted that most of her examinations were essentially normal, but that an MRI examination showed advanced degenerative spondylitic changes in the cervical spine, with impingement on the spinal cord. The doctor diagnosed Chronic Pain Syndrome

---

[2]A physiatrist is a physician who specializes in physical and rehabilitative medicine. Stedman's Medical Dictionary 1362 (26th ed. 1995).

and bilateral carpal tunnel syndrome. Two neurologists who examined O'Donnell also diagnosed Chronic Pain Syndrome, with one suggesting a strong functional overlay. At the conclusion of her stay, Dr. Goldman recommended a pain management program, noting surgery was not indicated. O'Donnell told the doctor that she could not enroll in such a program because her insurance was running out.

After reviewing the Mayo Clinic findings, Dr. Abrams recommended a pain management program, but O'Donnell declined at that time. Dr. Abrams continued to prescribe medications for pain, including Tylox and OxyContin. At the request of her attorney, in June 1997, Dr. Abrams wrote that O'Donnell had a closed head injury resulting in photophobia and severe headache and chronic cervical and neck pain related to disc disease and could not return to full-time work because of the impairments. In December 1997, Dr. Abrams referred O'Donnell to Dr. Loeb, a chiropractor. From December 1997 to January 1998, she saw Dr. Loeb two to three times a week for physical therapy, acupuncture, massage, and electrical stimulation.

In February 1998, O'Donnell appeared before an administrative law judge (ALJ). O'Donnell, seated in a wheelchair and wearing a hat and sun glasses, testified that since the accident in 1995 she had had constant pain in her back, neck, and shoulders; light sensitivity; headaches; numbness in her arms, fingers, and left leg; and problems with her knees and ankles. She claimed that if she took off her hat, she would lose her voice. O'Donnell stated that she had not had surgery, but noted the only recommended surgery was for her carpal tunnel syndrome and she was planning on having that surgery. O'Donnell stated that she could only sit for about one and a half hours and did not cook, drive, do housework, laundry, or grocery shop, noting her seventeen-old daughter did many of the household chores. O'Donnell stated that she had no outside activities and spent most of her day lying down. Although she said she had concentration problems, O'Donnell denied being depressed or having any other psychiatric problems, admitting she did not keep an appointment for a

consultative psychiatric examination. A friend submitted a statement corroborating O'Donnell's testimony concerning her limited daily activities.

The ALJ asked a vocational expert to assume that O'Donnell could alternately sit and stand, could not grip or do more than minimal writing, had "slight restrictions on daily activities," and few problems with concentration. The expert responded that although O'Donnell could not return to her former job, there were a number of jobs in the national economy she could do, such as information clerk, phone solicitor, and security monitor. However, the expert stated that if O'Donnell had deficiencies in concentration that would prevent her from completing work tasks, there would be no jobs.

At the end of the hearing, the ALJ told O'Donnell that in order for him to fairly evaluate her condition, she needed to undergo the consultative psychiatric evaluation. Pursuant to the ALJ's request, in March 1998, O'Donnell saw Dr. Scott Morrison, a board-certified psychiatrist. O'Donnell appeared at the examination wearing a hat and sunglasses, which she did not remove. In reviewing her history, Dr. Morrison noted that medical examinations showed that she had damage to her spine resulting in a pain syndrome involving severe headaches, photophobia, and back pain, and that she had had extensive medical treatment, but with no improvement. Dr. Morrison noted that O'Donnell appeared to be in acute distress and did "not seem to be exaggerating for effect." Dr. Morrison found "little to suggest malingering or symptom magnification," and no evidence of thought disorder or anything to suggest a psychiatric diagnosis.

In addition to receiving Dr. Morrison's report, the ALJ received Dr. Abrams's treatment notes from December 1997 to April 1998. In December 1998, the ALJ denied benefits, finding that her allegations of pain were not credible. Citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (Polaski) (subsequent history omitted), the ALJ noted that O'Donnell's work history and persistence in seeking medical treatment

reflected favorably on her credibility. However, the ALJ found that several factors undermined her credibility, noting there was no objective medical evidence that she needed to use a wheelchair or wear a hat and sunglasses; that she might have had a financial motivation in obtaining benefits; that she had not complied with prescribed treatment; and that some doctors had suggested she had magnified her symptoms. The ALJ gave "no weight" to Dr. Abrams's opinions, finding them conclusory. Relying on the vocational expert's testimony, the ALJ found that although O'Donnell could not return to her previous job as computer repair technician, she could perform a number of sedentary, unskilled jobs.

O'Donnell sought review in the Appeals Council, submitting additional evidence, including treatment notes from Dr. Abrams. A September 1998 note indicated that O'Donnell had taken Wellbutrin, an anti-depressant, but stopped taking it because it made her sleepy. An October 1998 note indicated that she was using a "patch" to stop smoking and had reduced her smoking about 75%. A July 1999 note indicated that O'Donnell had intractable pain and photophobia, which was probably permanent. In an April 11, 2000, note, Dr. Abrams summarized his records and noted that O'Donnell continued to complain of severe headaches, photophobia, and numbness in her legs due to post-traumatic vascular headaches, disc herniation, spondolytic spurring, lumbar degeneration, and nausea, possibly related to the headaches or medications. O'Donnell also submitted statements by her daughter and a friend corroborating her testimony of severely restricted daily activities. After consideration of the additional evidence, the Appeals Council denied her request for review. O'Donnell then sought judicial review. The district court granted the Commissioner's motion for summary judgment. This appeal follows.

**DISCUSSION**

"We review de novo a district court decision upholding the denial of social security benefits." Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002)

(Bowman). "We will affirm the ALJ's findings if they are supported by substantial evidence on the record as a whole." Id. (internal quotation omitted). "However, the review we undertake is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision[;] we also take into account whatever in the record fairly detracts from that decision." Id. (internal quotation omitted). In addition, when, as here, "'the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence.'" Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000) (quoting Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000)).

O'Donnell argues that the ALJ erred in discounting her allegations of disabling pain. We agree. It is well-settled that an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them. Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir. 1997) (Jones). In evaluating a claimant's allegations, in addition to the objective medical evidence, an ALJ must consider a claimant's "prior work history; daily activities; duration, frequency and intensity of the pain; dosage, effectiveness and side effects of medications; precipitating and aggravating factors; and functional restrictions." Bowman, 310 F.3d at 1083 (internal quotation omitted; citing Polaski). The ALJ must also consider "observations by third parties." Jones, 122 F.3d at 1151. As O'Donnell notes, there is objective medical evidence supporting, at least some of, her allegations of pain. For example, a 1997 MRI examination at the Mayo Clinic showed "[a]davnced degenerative spondylotic changes" in her cervical spine with impingement on her spinal cord.

Moreover, as the ALJ noted, O'Donnell's prior work history and persistence in seeking medical treatment for her complaints support her credibility. Her work history shows a fourteen-year record of responsible and well-paying jobs in the computer field. See Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999). For

-7-

example, in 1993, she earned over $50,000 at a major pharmaceutical company where she was a project leader, technical trainer, and supervisor. In 1994, she was selected as a participant in an entrepreneurial leadership program, completed a desktop publishing course, and tutored technicians who were working towards certifications. Although the ALJ discredited her allegations because he speculated that she might have had a financial motivation to obtain benefits, Dr. Abrams reported that O'Donnell wanted to return to work and to school. We have noted that "all disability claimants are financially motivated to some extent." Ramirez v. Barnhart, 292 F.3d 576, 581 n.4 (8th Cir. 2002).

As to her persistence in seeking medical treatment, "the record shows numerous trips to [numerous] doctors." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (Kelley). "She has availed herself of many pain treatment modalities, including a TENS unit, physical therapy, trigger point injections, chiropractic treatments, . . . , nerve blocks," acupuncture, massage, and pain medications. Id. "[S] he has had . . . many diagnostic tests, including, X-rays and MRIs." Id. She has traveled by airplane from her home in Missouri to Minnesota for a two-week evaluation by physicians at the Mayo Clinic, who, after exhaustive testing and examinations, diagnosed Chronic Pain Syndrome. In a similar situation, we have stated that "consistent diagnosis of chronic . . . pain, coupled with a long history of pain management and drug therapy," was an "objective medical fact" supporting a claimant's allegations of disabling pain. Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998) (Cox).

As to her drug therapy, we note that O'Donnell has taken powerful pain medications. Tylox is a controlled substance prescribed for "the relief of moderate to moderate severe pain." Physician's Desk Reference (PDR) 2597 (5th ed. 2002). Its main ingredient is oxycodone, which is a narcotic similar to morphine. Id. OxyContin, which is oxycodone, is prescribed for "the management of moderate to severe pain when a continuous, around the clock analgesic is needed for an extended

period of time." Id. at 2912. Skelaxin is a muscle relaxant prescribed for "acute, painful muscle conditions." Id. at 1304. See Bowman, 310 F.3d at 1083 (noting use of OxyContin and Skelaxin supported allegations of disabling pain). There is also no evidence undermining O'Donnell's description of her limited daily activities. Her testimony was consistent with the symptoms and description of activities she reported to the various doctors and was corroborated by the statements of a friend and her daughter. See Neeley v. Shalala, 997 F.2d 437, 441 (8th Cir. 1993) (noting ALJ improperly discounted claimant's spouse testimony of limited daily activity solely because it might have been influenced by sympathy for claimant). O'Donnell's daughter, who is a diabetic, wrote that her mother was a "shut-in" and had "made [her] one, too." An acquaintance, who was certified as a emergency medical technician, wrote that O'Donnell "was in need of help in her daily living," noting that O'Donnell's house was untidy and dusty. The acquaintance also wrote that she had to drive O'Donnell's daughter to the hospital because O'Donnell could not drive.

As the Commissioner notes, an ALJ may discount a claimant's allegations if there is evidence that a claimant was a malinger or was exaggerating symptoms for financial gain. However, the evidence as a whole does not support such a finding. Several doctors suggested that O'Donnell's might have been magnifying her pain due to a psychogenic overlay. However, even if true, that would not be a reason to discredit her allegations. An "ALJ cannot simply ignore . . . medical evidence that [claimant] suffers from pain having its origin in a psychological disorder." Mellon v. Heckler, 739 F.2d 1382, 1383 (8th Cir. 1984) (quoting Reinhart v. Secretary, 733 F.2d 571, 572-73 (8th Cir. 1984)). In any event, the doctors who examined and treated O'Donnell more recently did not indicate that she was magnifying her symptoms or malingering. See Davis v. Callahan, 125 F.3d 670, 672 (8th Cir. 1997) (holding evidence as a whole supported allegations of disabling pain even though one doctor suggested symptom magnification); Lannie v. Shalala, 51 F.3d 160, 164 (8th Cir. 1995) (holding ALJ erred in relying on consulting physician's belief that claimant was exaggerating problems where belief contradicted by opinion of treating physician).

-9-

We question whether a claimant who is intentionally exaggerating her symptoms for financial gain would seek out numerous evaluations, including traveling to the Mayo Clinic for an exhaustive evaluation, in efforts to obtain answers for the cause of her complaints. See Cox, 160 F.3d at 1207 (questioning whether a claimant with many "years of medical records detailing repeated complaints of severe pain" and treatments for severe pain could be found not credible).

In any event, when the ALJ sought a professional opinion as to whether O'Donnell was malingering or was magnifying her symptoms due to a psychiatric or emotional problem, Dr. Morrison, a board-certified psychiatrist, found "there [wa]s little to suggest malingering or symptom magnification." If the ALJ doubted Dr. Morrison's opinion or questioned its basis, he should have contacted the doctor for further information. From the medical records as a whole, it appears that although the physicians "have been unable to identify a specific physical cause for the amount of pain claimed by [O'Donnell], . . . [i]t is obvious that [they] have determined [she] was experiencing great pain." Id. at 1207-08.

We also agree with O'Donnell that the ALJ erred in giving Dr. Abrams's opinions "no weight." Dr. Abrams is a neurologist who has treated O'Donnell for over five years, has prescribed powerful pain medications, and has referred her to the Mayo Clinic for evaluation and to pain management clinics for physical therapy, trigger point injections, and epidural nerve blocks. See Kelley, 133 F.3d at 589 (holding opinion of treating specialist entitled to great weight). If the ALJ believed that Dr. Abrams's notes and opinions were of no value, given the extensive treatment history in this case, the ALJ was obligated to have contacted Dr. Abrams for "'additional evidence or clarification,'" Bowman, 310 F.3d at 1085 (quoting 20 C.F.R. § 404.1512(e)), and "for an assessment of' how the impairments limited [O'Donnell's] ability to engage in work-related activities.'" Id. (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).

Although we believe many of the <u>Polaski</u> factors support O'Donnell's subjective allegations of disabling pain, we nonetheless believe it is appropriate that the Commissioner be given the opportunity to more fully develop the record, especially as to the evidence from Dr. Abrams. <u>See</u> <u>Cox</u>, 160 F.3d at 1210. Because we remand this case for further development of the evidence and for a reevaluation of O'Donnell's subjective complaints and ability to perform work in the national economy, we will briefly note other errors the ALJ made in evaluating O'Donnell's allegations.

In some case, a claimant's failure to follow prescribed treatment may undermine her credibility. <u>See</u> <u>Holley v. Massanari</u>, 253 F.3d 1088, 1092 (8th Cir. 2001). This does not appear to be such a case. Although in 1995 and 1996, Dr. Schoolman recommended psychotherapy, which O'Donnell declined, at the hearing she explained she did not seek psychotherapy because she believed the origin of her pain was physical. Her belief was confirmed by her actions in seeing numerous doctors and undergoing an extensive evaluation at the Mayo Clinic. Her belief was also confirmed by the opinion of Dr. Morrison, the consulting psychiatrist, who found no evidence of a psychiatric disorder.

It is also true that on occasions O'Donnell declined to attend pain management programs. However, the ALJ failed to consider why she declined. In 1997, she explained to Dr. Goldman of the Mayo Clinic that she could not afford a program because her insurance was running out. In any event, she followed Dr. Abram's subsequent recommendations and attended pain and headache programs. The ALJ also noted that O'Donnell declined Dr. Abrams's recommendation to take an antidepressant. However, the ALJ ignored evidence that in 1996, she took the anti-depressant Zoloft, but had an adverse reaction to it and that was why she was reluctant to take another anti-depressant. We note that in 1998, she took an anti-depressant, but discontinued it because it made her sleepy.

-11-

The ALJ also did not believe her subjective allegations of disabling pain because she had not stopped smoking and had not lost weight. Given the evidence of her attempts to alleviate pain through medication, physical therapy, trigger point injections, nerve epidural blocks, and electrical stimulation, her failure to stop smoking and lose weight do not show that her complaints were not credible. See Kelley, 133 F.3d at 589. In any event, in 1998 she used a patch to help her stop smoking and Dr. Abrams reported that she had reduced her smoking significantly, but that her complaints continued. As to her failure to lose weight, this court has noted that a failure to lose weight is not necessarily inconsistent with allegations of disabling pain because a claimant's obesity may be due to the effects of medication or inability to exercise due to pain. See Ludden v. Bowen, 888 F.3d 1246, 1249 (8th Cir. 1989).

Accordingly, we reverse the judgment of the district court and remand with instructions to remand to the Commissioner for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-