334 F.Supp.2d 1155 (2004)
Kelly D. GUMP, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 2:03 CV 31 DDN.
United States District Court, E.D. Missouri, Northern Division.
August 16, 2004.
*1156 Anthony W. Bartels, Jonesboro, AR, for Plaintiff.
Raymond W. Gruender, III, Wesley D. Wedemeyer, Office of U.S. Attorney, St. Louis, Mo, for Defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security on the application of plaintiff Kelly D. Gump for a period of disability and disability insurance benefits under Title II and Subchapter XVIII, Part A, of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. The parties have consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. BACKGROUND
A. Plaintiff's application materials
In September 2000, plaintiff, who was born in 1963, applied for benefits, claiming she has been disabled since June 30, 2000. She alleged that a hip injury and a mental illness make her unable to maintain the ability required to do any job for an extended period of time due to extreme paranoia of fellow workers. These problems, she indicated, first bothered her in 1981. As to her daily activities, plaintiff indicated that she cooked twice a day, performed all household maintenance activities, shopped for groceries every day, read a lot, and drove once a month. (Tr. 106, 124, 146-49.)
In a work history report, she listed ten jobs she had held since 1990: a tray person at a hospital kitchen, a delicatessen worker at a grocery store, a lather at a construction company, a sewing machine operator at a factory, a sandwich maker at a restaurant, an assembly line worker at a Quaker Oats factory, a nurse's aide at a nursing home, an assembly line worker at "Rival" factory, an assembly line worker at a Tracker Boats (Tracker) factory, and a cartridge stuffer at a ribbon factory. For the first six jobs she completed forms on the report that directed her to provide details about the work. Earnings statements from 1979 to 2001 indicate that she *1157 generally had low annual earnings; in only three of the previous twelve years did she earn more than $4000. In her best year, 1994, she earned $7320.15 at Tracker. (Tr. 115, 118, 137-43.)
B. Plaintiff's medical records
In June 1998, plaintiff went to a hospital emergency room with multiple contusions from a domestic fight, including a swollen (but not fractured) right foot. (Tr. 356-58.)
On June 14, 2000, plaintiff began treatment at the Grand Lake Mental Health Center (Grand Lake). Upon admission, her diagnosis was schizoaffective disorder, cannabis abuse, alcohol abuse, asthma, and chronic bronchitis. Her Global Assessment of Functioning (GAF) was currently 40, "past 50." An initial comprehensive assessment indicated that her treatment was intended to last one year, with her goals being to maintain a job for one year and to report being happy within six months. During a June 15 counseling session at Grand Lake, she appeared restless and anxious, and had a labile[1] affect. She participated in some group discussions but had to leave the room because of her history of anger and anxiety around crowds. On June 21, she complained of hearing a voice telling her to hurt people, but indicated she did not follow through on what it told her. She also described mood swings. She admitted abusing intravenous cocaine, alcohol, marijuana, and methamphetamine, which her physician strongly urged her to discontinue using. He listed her prescription medications as Zypexa and Depakine. (Tr. 268-69, 321-22, 326.)
On June 27, 2000, plaintiff went to the emergency room, complaining that she had gone crazy, was seeing things, and could not eat or sleep. It was noted that she had stopped taking her medications the previous week. A mental health practitioner completed a statement to support a peace officer's affidavit to have plaintiff taken into protective custody for treatment. She believed that plaintiff had homicidal ideation and schizophrenia and was a danger to herself or others. Thus, plaintiff was admitted into Grand Lake. Her GAF was "15/50." Her projected stay was 3 to 7 days. (Tr. 316-17, 335, 338-40.)
Between July 3 and July 19, 2000, plaintiff was treated at the Baptist Regional Health Center. Upon admission, she stated that she was hearing voices and seeing shadows. She had unresolved anger issues. Her GAF was 20 on July 5. The final diagnosis was intermittent explosive disorder, polysubstance dependence, personality disorder, and asthma. Her GAF at discharge was 45; her highest GAF for the past year was 60. She was prescribed Depakote, Robaxin, Flovin inhaler, Prozac, and Celebrex. It was noted that she would need long-term outpatient therapy. (Tr. 182-83, 187.)
An August 16, 2000 Grand Lake progress note indicated plaintiff reported dizziness, headaches, nausea, and blacking out and was focusing on getting back on her medications. (Tr. 303.)
On January 4, 2001, psychologist Peggy Bowen, Ph.D., administered a mental status examination. Plaintiff was alert and oriented to time, place, and person. She reported drinking at least a gallon of Vodka per day as recently as March 2000 and had been arrested for fighting and driving under the influence. She smoked marijuana whenever she could. (Tr. 248-50.)
Dr. Bowen's diagnostic impressions were schizoaffective disorder, cannabis *1158 abuse, and alcohol abuse, with a GAF of 55. She found some evidence of exaggeration, embellishment, and malingering and she stated that, according to the mental status examination, plaintiff was not limited in her ability to do work-related mental activities, such as understand, remember, sustain concentration, and persist. She opined that plaintiff (1) was limited socially interacting and adapting with others given her history of fighting, (2) was unable to sustain employment, living conditions, and relationships for more than a short time period, and (3) would be unable to self-manage funds. (Tr. 251.)
On January 16, 2001, non-examining psychiatrist Bernard L. Pearce, Ph.D., opined that plaintiff had marked restrictions in activities of daily living, in maintaining social functioning, and in concentration, persistence, or pace; and that she had had three repeated decompensation episodes of extended duration. He suggested that drug and alcohol abuse were material. (Tr. 264, 266.)
On May 2, 2001, plaintiff, who had missed her previous appointment at Grand Lake, reported having stopped her medications because Paxil gave her a headache, Lithium caused excessive urination, and she did not want to take Risperdal. J.W. Coonfield, M.D., then recommended three "good, safe medications," but she did not want to take them. She informed him that she had been on Depaken before and it had helped her and that she wanted to try Trazodone; he prescribed both medications for her. (Tr. 275.)
Sporadic attendance coupled with medication non-compliance resulted in plaintiff's discharge from treatment at Grand Lake on May 11, 2001. Her discharge diagnosis included schizoaffective disorder, bipolar type, explosive disorder, intermittent polysubstance abuse, borderline personality disorder, and a GAF of 40. (Tr. 268-69.)
On June 20, 2001, she went to the emergency room with a hot water burn on her abdomen and right side, stating that she had dropped hot water on herself while cooking. (Tr. 331.)
On July 12, 2001, plaintiff underwent a psychological evaluation by Jan Snider Kent, Ph.D., and reported a history of mental illness in her family, abuse by family members, low grades in school, fighting with peers, and conflicts with authority. She stated that she had a series of nineteen short-term jobs, varying from one day to several months. She reported that in the past she used alcohol and marijuana and had attempted suicide. As for her daily activities, she stated that she gets up around 10:00 a.m., cleans house all day, and watches movies and reads, although some days she cannot concentrate on what she reads. She added that she does not like to go out in public stores because of her urge to hit somebody. She also reported depression, obsessive-compulsive symptoms, and hallucinations. (Tr. 360-62.)
Dr. Kent noted that the results of a combined assessment of three tests indicated that plaintiff had no impairment by dementia or delirium. He found that she was in the average range for intellectual functioning and the borderline range for auditory attention and concentration, had difficulty sustaining treatment due to conflicts with treatment providers, did not appear to have any significant difficulties understanding and remembering simple or complex instructions, had shown difficulty sustaining concentration and persistence with tasks and interacting socially, and had no limitations in adapting to her environment. His diagnosis included schizoaffective disorder, bipolar-disorder not otherwise specified, with psychotic features, a history of alcohol and cannabis abuse, and a GAF of 41. He believed that she would *1159 be able to manage her own funds. (Tr. 363-64.)
On August 1, 2001, Sally Varghese, M.D., completed a Functional Capacity Assessment, rating as "Markedly Limited" plaintiff's abilities to understand and remember detailed instructions, carry out such instructions, and interact appropriately with the public. In the many other sub-categories of understanding and memory, sustained concentration and persistence, social interaction, and adaption, no significant limitations were indicated. Thus, in a Psychiatric Review Technique form, Dr. Varghese concluded that plaintiff had moderate restrictions on activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. She noted that plaintiff's cognitive skills were fairly intact and that plaintiff could relate superficially, had poor social skills which could improve with treatment, and could perform simple tasks. (Tr. 377, 379, 381-82.)
On May 14, 2002, plaintiff self-admitted into Heartland Health, describing symptoms of depression related to her current life circumstances, i.e., she was homeless because her ex-husband kicked her out of his house. She also complained of hearing voices and described thoughts of harming herself and others but had no plan of acting. She did not intend to quit using marijuana. Her GAF was 20. Her doctor believed that her being arrested for not having a driver's license and stealing may have triggered the admission. She was started on Fluoxetine, which she stated had helped her previously. Thereafter, her condition improved rapidly. On discharge on May 18, she was in improved condition but was not interested in a plan of change. Her diagnosis on discharge was depressive disorder, not otherwise specified; marijuana dependence; unspecified mental disorder with symptom exaggeration; borderline personality disorder; and a GAF of 60. She was prescribed a low-dose antipsychotic until May 21,2002. (Tr. 391-93.)
C. The hearing testimony
At the hearing before the Administrative Law Judge (ALJ) on September 9, 2002, plaintiff testified to the following. She has an eleventh-grade education and can read and write, but she cannot balance her checkbook. She has no driver's license; after it was suspended she did not get a new one. She has either quit or been fired from many jobs. At Tracker, she had installed boat lights, gas caps, and motor shifters using hand tools and lifted "maybe five pounds." (Tr. 38-40, 68.)
She takes Prozac and Vistaril. Other medications caused side effects or she just did not feel like taking them. She cannot keep a job long enough to maintain a normal lifestyle. At work, she cannot remember what she learned the previous day. She has audio and visual hallucinations. Twice she has attempted suicide and has hurt people in fights.[2] She often gets confused, e.g., she forgets she is cooking and then burns herself. Sometimes she goes days without eating without knowing it and forgets to take her medicine. She suffers from anxiety, depression, and paranoia. Because of her depression, she laid in bed for two weeks in October 2001. Sometimes she does not feel like she can be around people. She has problems handling stress or pressure. She has not smoked marijuana in over a year and has decreased her alcohol consumption. (Tr. 41, 43-47, 49-51, 53, 74.)
*1160 In addition, she has an unknown stomach problem, perhaps "spastic colon or something," and suffers from asthma and allergies. She was born with displaced hips, which have worsened over time and cause her to fall unexpectedly. She can sit in a chair but her legs fall asleep. She cannot walk a half a block without feeling pain and can only stand for 30 minutes without having to move around or sit. She does not have good hand strength. She cannot keep her attention and concentration for very long. Sometimes her daughters have to remind her to shower. Her hobbies include reading. (Tr. 49, 51, 54-58.)
Vocational Expert (VE) Marianne Lumpe, present throughout the hearing, testified that jobs plaintiff performed in the past, as classified in the Dictionary of Occupational Titles (DOT), could be characterized as (1) kitchen helper, medium unskilled work, (2) hand packer, medium unskilled work, (3) certified nurse's assistant, medium semi-skilled work, (4) sewing machine operator/applique, light semi-skilled, (5) fast food worker, light unskilled, (6) assembly/boat accessories, medium semi-skilled, (7) bartender, light low-ended semi-skilled, and (8) waitress, light low-ended semi-skilled. She believed that plaintiff could not perform any of her past work at a level other than as indicated by the DOT. (Tr. 80.)
The ALJ described to the VE a hypothetical individual who (1) is of plaintiff's age, with a limited education, and past relevant work as above, (2) has schizoaffective disorder, personality trait disorder variously classified, a history of polysubstance abuse, a history of asthma and allergies, and medically determinable impairments resulting in complaints of hip and various joint pains, and stomach problems, (3) is limited to simple, routine, repetitive work not involving independent judgment for decision-making and not requiring constant attention to detail, (4) is limited to occasional contact with the public, co-workers, and supervisors, (5) requires occasional supervision, (6) cannot work at more than a "regular" pace (out of fast, regular, or slow), and (7) should not work at more than a mild to moderate stress level. (Tr. 81-82.)
When the ALJ asked whether this individual would be able to perform any jobs she previously performed within the national economy, the VE responded that the jobs of kitchen helper, hand packer, laundry worker, small parts assembler, and spin cartridge loader would meet the ALJ's requirements. When the ALJ added to the hypothetical that the individual could not (1) lift more than 10 pounds, (2) stand more than 30 minutes at a time, (3) sit more than 10 minutes at a time, (4) walk more than half a block at a time, (5) squat or crawl more than occasionally, and (6) be exposed to excessive heat, humidity, or cold or more than moderate levels of dust, fumes, or smoke or have excessive skin contact with soaps, the VE opined that she could perform as a cartridge spin loader, a packer or package loader, and as a small parts assembler. When plaintiff's attorney asked the VE to assume that the individual has visual and auditory hallucinations, is somewhat suicidal, gets confused, rambles, and has to be shown every day how to do the job she was shown to do the previous day, the VE indicated that not remembering from day to day how to do simple, routine tasks "would not be a characteristic of work in a competitive open labor market." (Tr. 82-84.)
D. The ALJ's decision
In a November 26, 2002 decision, the ALJ found the following. Plaintiff has not engaged in substantial gainful activity since June 30, 2000. She has severe impairments of schizophrenic disorder, personality *1161 trait disorder variously classified, a history of polysubstance abuse, and a history of asthma but no impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The evidence has failed to establish the existence of any medically determinable impairment which could reasonably be responsible for claimant's allegations of hip and other joint pain. Plaintiff's hearing testimony regarding the intensity and severity of symptoms, considered under the standards of Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984), was not credible for the reasons outlined in the body of the decision. (Tr. 18, 24.)
Those reasons were that (1) plaintiff does not have a long work history with higher earnings, (2) medications have been helpful in minimizing or resolving her symptoms, (3) no side effect of medications was found which lasted for a 12-month continuous period and which would reduce her functional capacity beyond what the ALJ otherwise found (as discussed in the following paragraph), (4) plaintiff's allegation that she may lay in bed for up to four days was not persistently made to treating or evaluating doctors,[3] (5) plaintiff's allegations of exertional limitations were not established by evidence, (6) she indicated she read all kinds of things and understood what she read, and (7) she was able to attend and respond adequately at the hearing. (Tr. 22.)
Next, the ALJ found the following. As to RFC, plaintiff is able to do only simple, routine, repetitive work not requiring use of independent judgment or constant attention to detail. She may have occasional contact with the public, coworkers, and supervisors. She needs occasional supervision and should avoid stress above a mild to moderate level. She is able to work at a regular pace. Plaintiff's "past relevant work as a kitchen helper and hand packager, among others, did not require the performance of work-related activities precluded by the above limitation(s)" (emphasis added). Moreover, plaintiff's impairments do not prevent plaintiff from performing her past relevant work. Thus, she is not disabled. (Tr. 24.)
E. Plaintiff's arguments
In her brief, plaintiff argues that the ALJ erred in assessing her credibility (Doc. 16 at 24-27) and in determining that she could perform past relevant work because substantial evidence did not support the conclusion that the jobs identified constituted substantial gainful activity (id. at 14-16). Alternatively, she argues that the medical evidence does not support the ALJ's RFC determination (id. at 20-24) and that there is no evidence that she has the RFC to perform any past work (id. at 16-20).

II. DISCUSSION
A. General legal framework
The court's role on review is to determine whether substantial evidence in the record as a whole supports the Commissioner's findings. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 *1162 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
To be entitled to benefits on account of disability, a claimant must prove that she is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir.2003).
B. Credibility
Substantial evidence supports the ALJ's adverse credibility determination. The ALJ cited Polaski and stated that consideration was given to the factors set forth therein for assessing plaintiff's subjective complaints. See 739 F.2d at 1322 (an ALJ should consider all the relevant evidence, including the claimant's work record, and observations by third parties and doctors relating to daily activities, the duration, frequency, and intensity of the pain, precipitating and aggravating factors, dosage, effectiveness, and side effects of medication, and functional restrictions). The ALJ provided numerous (and valid) reasons for the adverse credibility determination. See Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir.2004) (the ALJ may discount subjective complaints if there are inconsistencies in the evidence as a whole); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir.2001) ("A lack of work history may indicate a lack of motivation to work rather than a lack of ability."); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir.2001) (the ALJ's personal observation of the claimant's demeanor "is completely proper in making credibility determinations"; acts which are inconsistent with a claimant's assertion of disability reflect negatively upon the claimant's credibility); Shelton v. Chater, 87 F.3d 992, 995 (8th Cir.1996) (upholding the adverse credibility determination in part because claimant's problems appeared to be controlled with medication); cf. O'Donnell v. Barnhart, 318 F.3d 811, 816-17 (8th Cir.2003) ("an ALJ may not discount a claimant's allegations ... solely because the objective medical evidence does not fully support them" (emphasis added)). Thus, recognizing that "[t]he ALJ is in the best position to determine the credibility of the testimony," this court grants deference in that regard. Johnson, 240 F.3d at 1147.
C. Substantial gainful activity
"A job is past relevant work if it was `done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity.'" Moad v. Massanari, 260 F.3d 887, 890 (8th Cir.2001) (quoting 20 C.F.R. § 404.1565(a)). "Substantial gainful activity is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. Specifically, "[s]ubstantial work activity is work activity that involves doing significant physical or mental activities," whereas "[g]ainful work activity is work activity that [is done] for pay or profit." 20 C.F.R. § 404.1572(a)-(b). A claimant's earnings will ordinarily show that the claimant has engaged in substantial gainful activity if the earnings averaged more than $500 a month from January 1990 through June 1999 or more than $700 a month from July 1999 through December 2000. 20 C.F.R. § 404.1574(b)(2).
*1163 "The Commissioner admits that at a minimum the record is very confusing as to exactly which of Plaintiff's past employment opportunities the vocational expert was classifying as kitchen helper or hand packager" and "that most likely several of these employment opportunities cannot be classified as past relevant work, as it was unclear if the jobs lasted long enough for Plaintiff to learn to do them and constituted substantial gainful activity." (Doc. 17 at 2-3.) But the Commissioner urges the court not to remand because, "while the ALJ did not specify what jobs he meant by among others, it was clearly meant to include the additional positions referred to by the [VE], i.e., laundry worker,[4] small parts assembler, and spin cartridge loader." (Id. at 4.)
As the Commissioner apparently concedes, substantial evidence does not support the ALJ's determination that plaintiff had past relevant work as a kitchen helper or a hand packager. Plaintiff's earning records do not demonstrate that either of these jobs was performed at a substantially gainful level. See 20 C.F.R. § 404.1574(b)(2). Therefore, the ALJ's decision is fatally flawed and remand is necessary on this basis alone.
Moreover, the court does not believe that the words "among others" rescues the ALJ's decision. The court will not speculate that the ALJ meant to conclude that plaintiff's assembly line job at Tracker constituted past relevant work and that plaintiff retained the capacity to perform that work as it is performed in the general economy. See Woodruff v. Chater, 1996 WL 10925, at *4 (N.D.Ill.1996) ("Speculation is forbidden because it would require the court to weigh and assess the evidence, a role reserved for Commissioner."); cf. Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 646 (8th Cir.2004) (the court may not substitute its judgment for that of the ALJ). Lubinski v. Sullivan, 952 F.2d 214, 216 (8th Cir.1991), cited by the Commissioner in support of the proposition that the ALJ's failure to refer directly to the other jobs constitutes harmless error, does not support such a proposition. In Sullivan, the Eighth Circuit merely held that the ALJ's failure to recognize that the Secretary has the burden of proving that the claimant, with multiple problems, can perform other work is error unless evidence is strong enough to support the outcome despite the lapse. Id. at 216.
In addition, the ALJ did not satisfy the "duty to `fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work.'" Sells v. Shalala, 48 F.3d 1044, 1046 (8th Cir.1995) (quoting Nimick v. Sec. of Health & Human Serv., 887 F.2d 864, 866 (8th Cir.1989)); see SSR 82-62, 1982 WL 31386, *3 (SSA 82-62) ("Since [whether the claimant retains the functional capacity to perform past work] is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit."). Although the ALJ elicited testimony that plaintiff was not sure how much she lifted or carried at Tracker and that the amount was "maybe five pounds," the record does not indicate whether this was the greatest weight she lifted or the amount she lifted occasionally. Even though she testified about some details of her work at Tracker, she made no mention of the mental demands of that *1164 work or of other exertional demands of that work and the ALJ failed to make explicit findings regarding the physical and mental demands of such work. See Ingram v. Chater, 107 F.3d 598, 604 (8th Cir.1997) ("A conclusory determination that a claimant can perform past work without [the requisite explicit] findings, does not constitute substantial evidence that the claimant is able to return to his past work."). Finally, the ALJ's reference to the DOT pertained to the kitchen-helper and hand-packer occupations, not the specific description of the job at Tracker. See Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir.1999) (the ALJ may discharge the duty to make explicit findings regarding the actual physical and mental demands of the claimant's past work by referring to the "specific job descriptions" in the DOT that are associated with the claimant's past work). This lack of an express reference reflects more than a mere deficiency in opinion-writing in this case. See id.; Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir.1991).[5]
NOTES
[1] Unstable, unsteady, denoting an adaptability to alteration or modification. Stedman's Medical Dictionary at 831 (25th ed.1990).
[2] At the time of the hearing, plaintiff was awaiting sentencing after pleading guilty for hitting and knifing a woman. (Tr. 46.)
[3] In the same paragraph that addresses plaintiff's testimony about staying in bed, the ALJ also summarizes plaintiff's testimony regarding trouble balancing her checkbook or doing math problems and forgetfulness. (Tr. 22.) The ALJ's decision does not clearly indicate whether these statements were also discredited.
[4] The laundry work was performed for one month and after plaintiff's alleged disability onset date. (Tr. 40, 60.) Such work, the ALJ concluded, "does not represent the performance of substantial gainful activity." (Tr. 17.)
[5] Because remand is necessary on the basis that substantial evidence does not support the ALJ's determination of past relevant work, the court does not reach plaintiff's alternative arguments concerning the determination and application of plaintiff's RFC other than to point out that the ALJ was only required to assess plaintiff's RFC based on all relevant, credible evidence in the record, see Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir.2004), and that although plaintiff at times had sub-60 GAF scores, she did not have such scores for very long, i.e., she was admitted for hospitalization on May 14, 2002, with a GAF of 20 but, on discharge a few days later, had a GAF of 60, see Diagnostic and Statistical Manual of Mental Disorders 32, 34 (4th ed. Text Revision 2000).