**Lucille GAUDET, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

**No. 3:02–CV–90035.**

United States District Court,
S.D. Iowa,
Davenport Division.

March 7, 2003.

Mary Hoefer, Esq., Iowa City, IA, for plaintiff.

Inga Bumbary–Langston, Esq., Assistant United States Attorney, Des Moines, IA, for defendant.

### ORDER

PRATT, District Judge.

Plaintiff, Lucille Gaudet, filed a Complaint in this Court on April 18, 2002, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

### BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on November 1, 1994, claiming to be disabled since October 10, 1994. Tr. at 187–89. Plaintiff was last insured for Title II benefits at the end of June 1998. Tr. at 34.

After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge John P. Johnson (ALJ) on December 12, 1996. Tr. at 57–104. The ALJ issued a Notice Of Decision—Unfavorable on August 8, 1997. Tr. at 569–600. On November 21, 1998, the Appeals Council remanded the case back to the ALJ for consideration of new evidence which was submitted, and for further development. Tr. at 743–46. The remand hearing was held August 17, 1999. Tr. at 105–53. The ALJ issued a Notice Of Decision—Unfavorable on September 23, 1999. Tr. at 15–46. The Appeals Council affirmed the ALJ's decision on February 19, 2002. Plaintiff filed a Complaint in this Court on April 18, 2002.

### MEDICAL & VOCATIONAL RECORDS

The Court has read each page of this voluminous (947 page) record. Although much of the record is summarized below, any omissions from this discussion should not be taken as an indication that the entire record was not reviewed. Rather the Court will mention here only those

portions of the record which are most material to this decision.

From approximately 1967 until 1990, Plaintiff worked in various capacities as a registered nurse. Tr. at 557 & 240. An office note from the Steindler Orthopedic Clinic dated October 20, 1988, states that during the previous week, Plaintiff was transferring a patient and injured her back. Mark C. Mysnyk, M.D. wrote: "She describes typical low back strain, and that's what I feel she has." Tr. at 299. On November 15, 1988, Plaintiff's back pain was improved, but she complained of abdominal pain for which Dr. Mysnyk suggested that Plaintiff see a general surgeon or OB/GYN doctor. Tr. at 300. Plaintiff saw Dr. Mysnyk again on April 28, 1989. She reported that she was having pain in her left buttocks, down her posterior thigh and calf. She also had the sensation of her heel and little toe side of the foot being asleep. Tr. at 301. The doctor wrote that Plaintiff had symptoms and signs of a left S1 nerve root impingement most likely due to herniated disc. Tr. at 302. An epidural injection was attempted during a hospitalization from May 1 to 5, 1989 (Tr. at 307–16), but there was an inadvertent dural puncture (Tr. at 308). A CT scan of the lumbar spine on May 2, 1989, showed disc herniation on the left side at L5–S1 with "considerable displacement of the passing nerve root at this level." Tr. at 309. Electromography on May 3, 1989 was abnormal and compatible with left S1 radiculopathy. Tr. at 310. A successful injection was made on May 10, 1989. Tr. at 316. A week after an epidural injection Plaintiff had numbness in her right leg. The doctor wrote that Plaintiff was "significantly disabled" by the pain and he recommended that Plaintiff see someone about surgery. Tr. at 303.

On March 20, 1990, Thomas C. Boysen, M.D. wrote a report in which he outlined his assessment and treatment of Plaintiff between April 22, 1988 and April 5, 1989. Tr. at 304–06. When seen on April 22, 1988, Plaintiff had skin eruptions on her hands and ankles. The doctor prescribed medication and on May 4, 1988, Plaintiff showed marked improvement. Plaintiff returned on February 24, 1989 complaining of large areas of dermatitis on her extremities. Dr. Boysen again prescribed medication and on April 5, 1989, the condition had almost cleared. Tr. at 305.

An Iowa Department of Vocational Rehabilitation report of an intake interview dated June 4, 1990, states that Plaintiff was seeking services to find a way to utilize "her vast experience in nursing and related professions in an alternate work situation." In addition to back problems, which interfered with her ability to lift, stand and sit, Plaintiff had been diagnosed with bronchial asthma and allergic rhinitis for which Plaintiff was taking a number of medications. Her respiratory problems also imposed environmental limitations such as the need to avoid dust, fumes, temperature change, dust mites, pollens, molds, and smells. Plaintiff also had diabetes which had been caused (Tr. at 625 "steroid induced diabetes mellitus"), or at least aggravated by (Tr. at 278) the steroid medication used to control her asthma. Tr. at 239. The diabetes was diagnosed in March of 1985. Tr. at 278. In October of 1988, Plaintiff was treated for multiple severe open skin lesions on her hands, forearms, and feet while she was working at the Veterans Administration Medical Center. Tr. at 266. At the time of the Vocational Rehabilitation interview, Plaintiff was receiving Social Security Survivors benefits for herself and her children because her husband has passed away. Tr. at 239. Because of her illnesses and injuries it was decided that Plaintiff would seek work in the field of vocational rehabilitation. Tr. at 243. On February 6, 1992, it was noted that there was a need for a

job coach for which Plaintiff was thought to be a good candidate. On March 20, 1992, the note states that Plaintiff was to begin working as a job coach for Goodwill Industries on the following Monday. Tr. at 248. On November 3, 1992, Plaintiff's counselor wrote that Plaintiff had been working as a job coach since July 14, 1992, between 20 and 40 hours per week, depending on the assignment and depending on the severity of Plaintiff's back condition. Tr. at 250. The counselor wrote: "Lucy is viewed in a very positive way and according to Lora Morgan, coordinator of the Pathways program, client is one of the best coaches they have had in quite some time. In fact, Lora has frequently commented to this counselor that they wished the client was physically able to handle full time employment as they certainly would have been interested in hiring her into one of the permanent 3/4 time slots that Goodwill has available." Tr. at 250–51. Plaintiff was happy being able to work part time and noted that she was unable to pursue more education on a full time basis because it exacerbated her physical symptoms. Tr. at 251.

On April 5, 1990, William R. Pontarelli, M.D. wrote that he had treated Plaintiff since June of 1989 for her back pain. Plaintiff underwent a laminectomy on June 13, 1989 (See Tr. at 340 which is the report of surgery), which relieved her of sciatic pain but left her with severe episodic back pain whenever she was on her feet too long, or lifted too much weight. Dr. Pontarelli stated that Plaintiff should not work as a nurse which required lifting patients and required long periods of standing. Tr. at 317. The doctor also opined that Plaintiff would have off-the-job difficulties with house cleaning, traveling for more than an hour, or repetitive twisting body movements. Tr. at 318. On December 18, 1989, Dr. Pontarelli observed that Plaintiff was experiencing depression because of her multiple medical conditions and be-

cause of numerous circumstances such as the loss of her mother. Plaintiff was also disturbed because she did not feel her injury had been well documented for purposes of her worker's compensation case. Plaintiff had re-injured herself moving a patient's bed and she was upset that she had not been given clearer instructions regarding her limitations. Tr. at 331. On August 2, 1990, Plaintiff told Dr. Pontarelli that she had been refinishing some furniture which created lateral elbow pain radiating down her forearm. The doctor diagnosed lateral epicondylitis. He injected the arm and placed it in a splint. Tr. at 375. On August 16, 1990, Plaintiff phoned the doctor's office and asked for pain medication for complaints of back pain. She was given a prescription for Tylenol # 3. Tr. at 378.

On January 11, 1991, Plaintiff saw Richard Berge, M.D. at the Steindler Clinic in Dr. Pontarelli's absence. Plaintiff reported low back pain, and the doctor considered an MRI to determine if there was some recurrent herniation or scarring. Plaintiff asked for a TENS unit which Dr. Berge wanted Dr. Pontarelli to prescribe when he returned to the clinic. The doctor concluded his report by writing that he would speak to Dr. Pontarelli about the MRI and that perhaps an epidural should be considered. He continued: "But the fact is she still needs the TENS and is unable to work for 2 years." Tr. at 384. When Plaintiff was seen by Dr. Berge on February 13, 1991, she stated she had an epidural injection about two weeks before. She felt better for a few days, but the pain came back. Tr. at 385.

When Plaintiff saw Dr. Pontarelli on August 5, 1991, she had taken a three hour class but she needed to have frequent standing breaks. Plaintiff was "suffering considerable discomfort" for which she was given samples of Meclomen for pain, and

Flexoril for spasm. Tr. at 387. On September 13, 1991, Plaintiff saw Dr. Berge. She told the doctor that she was worried about more herniation in her back because sitting through a 2–3 hour class was too much. Plaintiff reported pain down the left leg. She also reported symptoms of tennis elbow, pain, spasms and cramps in the left arm. The doctor had nothing to offer Plaintiff other than verbal support. Tr. at 388. Plaintiff saw Dr. Pontarelli on April 1, 1992 "complaining of chronic pain as usual with some cramping of all muscle groups in her lower and upper extremities." The doctor wrote that he could not explain Plaintiff's complaints. The doctor wrote that he enumerated "certain restrictions" with which Plaintiff should work. Tr. at 389.

On February 4, 1993, Dr. Pontarelli stated that Plaintiff may have had a recurrence of herniated disc, and stated that a lumbar epidural would be considered if she did not improve. Tr. at 391. On March 11, 1993, Plaintiff reported relief with the epidural (Tr. at 873, epidural injection on February 19, 1993), and Dr. Pontarelli said that a second injection should be ordered (Tr. at 872 epidural injection March 16, 1993). Tr. at 393. Plaintiff had an epidural injection on February 1, 1994. Tr. at 871. Plaintiff had an MRI of her lumbar spine February 16, 1994, which showed bulging, to various degrees, at L4/5, and L3/4, and postsurgical changes at L4/S1. Tr. at 869–70. On April 7, 1994, Plaintiff told Dr. Pontarelli that she had returned to work, but that after 10 days, she developed sciatic pain. The doctor ordered another epidural (see Tr. at 868 report of injection on April 12, 1994). On April 21, 1994, Plaintiff was "able to tolerate work barely." Tr. at 394. On July 11, 1994, Plaintiff was making good progress with her function, so Dr. Pontarelli released her to her job with "the usual restrictions." On August 30, 1994, Plaintiff had a reactivation of her back and leg pain and on

September 15, 1994, Dr. Pontarelli ordered another epidural injection (see Tr. at 867 report of injection September 22, 1994). Tr. at 395.

Here it should be remembered that Plaintiff's alleged onset of disability date is October 10, 1994. On October 10, 1994 (Tr. at 398), Dr. Pontarelli wrote that Plaintiff was getting worse instead of better so he ordered an MRI which was taken on October 12, 1994 (Tr. at 865). Tr. at 396–97. The MRI showed "a new focal disc protrusion" at L4–5 "causing moderate to moderately severe mass effect upon the thecal sac." It also showed disc bulging at L3–4, resulting in mild to moderate central stenosis. Tr. at 397. Plaintiff had another epidural injection October 21, 1994. Tr. at 864. She was given another injection November 11, 1994. Tr. at 863.

From February 14, 1994 through August 23, 1995, Plaintiff was treated by Louise H. Sparks, M.D. for psoriasis, inflammatory arthritis, and diarrhea. Tr. at 628–40. Regarding the arthritis, Dr. Sparks noted that there was a question of psoriatic versus wide spread degenerative arthritis. Tr. at 628. Lab reports during that time showed that Plaintiff's blood sugars were often quite high. For example, on February 23, 1995, Plaintiff has a glucose reading of 405 which was noted to be very high. Tr. at 640.

In a letter dated October 27, 1994, Dr. Pontarelli wrote that Plaintiff was "suffering from persistent back and leg pain which is disabling her." The doctor said that Plaintiff was unable to work because she can not sit or stand for more than 20 minutes and that she needs to lie down frequently. Tr. at 399. On December 16, 1994, Plaintiff underwent hemilaminectomy of L5 on the left with exploration of L5–S1, exploration of L4–5, and diskectomy at L4–5. Tr. at 450. On February 1, 1995, Plaintiff told Dr. Pontarelli that she

had obtained some relief after the surgery. Tr. at 401. On March 1, 1995, Dr. Pontarelli wrote that Plaintiff was making gradual, slow, barely measurable improvement. Plaintiff required less narcotic medication, but she still "has bouts of persistent severe sciatic pain and back pain." The note dated April 3, 1995, states that Plaintiff had developed abdominal pain and was being evaluated by Noufal Jajeh, M.D. who did several diagnostic studies to determine the cause of the problem. Tr. at 406. See also Tr. at 473 which is a report of a March 9, 1995 endoscopic retrograde cholangiopancreatography with sphincter of Oddi manometry and sphincterotomy after which Plaintiff was observed overnight and discharged.

Plaintiff was hospitalized March 11 to 17, 1995, under Dr. Jajeh's care because she "started having acute right lower quadrant abdominal pain with elevated temperature earlier in the day." The doctor was suspicious of the possibility of appendicitis. Tr. at 480. Plaintiff was treated with antibiotics which resolved the pain without surgery. Tr. at 481.

On May 17, 1995, Dr. Pontarelli ordered another caudal epidural because Plaintiff was still having severe back and sciatic pain (the injection was given May 19, 1995. Tr. at 862). It was noted on May 31, 1995 that the injection had actually made Plaintiff's pain worse. On June 28, 1995, Plaintiff reported numbness in her heels and weakness of plantar flexion. The weakness was confirmed on physical examination. Dr. Pontarelli recommended an MRI to rule out a third hernia. On July 5, 1995, a review of the MRI, which took place June 29, 1995 (Tr. at 860), did not show disc hernia, but it did show epidural fibrosis of the L5 and S1 nerve roots on the left. Tr. at 407 and 409. Plaintiff received an injection on July 10, 1995. Tr. at 858. On July 14, 1995, four days after an epidural injection, Plaintiff said that she was "in a lot of pain." Tr. at 410.

Plaintiff saw Dr. Jajeh on August 30, 1995, because of C-difficile induced diarrhea with probable colitis. Tr. at 650. Plaintiff saw Dr. Jajeh again on January 22, 1996 complaining of burning in the periumbilical area. Plaintiff also complained of fatigue which the doctor attributed to Flagyl which he advised her to stop taking. Dr. Jajeh opined that a cardiac evaluation was appropriate given the risk factor of Plaintiff's diabetes. An appointment was made with Dr. Thomas Layman. Tr. at 649.

Plaintiff saw Robert Bar, M.D., at the University of Iowa in the Diabetes Clinic on November 10, 1995, for her diabetes. On physical examination, Plaintiff appeared very agitated, annoyed, and upset because she had to wait for over an hour to see the doctor. Tr. at 644. It was unclear to Dr. Bar why Plaintiff's blood sugar control had worsened, but he modified the dosage of insulin, and encouraged Plaintiff to increase her physical activity. Tr. at 645. On January 10, 1996, Plaintiff saw Dr. Bar again. Plaintiff showed the doctor "very elaborate records of her blood sugars." These records indicated that Plaintiff's blood sugar had been ranging from around 130 to 225. Tr. at 642. Dr. Bar opined that given Plaintiff's "other health problems," her diabetes control was acceptable. The doctor recommended that Plaintiff begin taking metformin. Tr. at 643.

On February 8, 1996, Plaintiff was seen by Andrew C. Peterson, M.D. for an evaluation of her sleep problems. Tr. at 651–55. Plaintiff reported an inability to get to sleep, intermittent sleep maintenance insomnia, problems with nocturnal asthma, and chronic excessive daytime sleepiness—a problem which had been getting worse in the last six years. Tr. at 651. Plaintiff

said that she had quit smoking in December of 1994. Dr. Peterson reviewed a polysomnogram which he said showed a very distorted sleep architecture. Tr. at 653. The sleep study, however, was non-diagnostic because Plaintiff did not take her usual dosage of Tylenol # 3 before sleep. This, the doctor wrote, put her into an acute withdrawal on the night of the study. The doctor stated that Plaintiff was clearly overweight, had chronic pain and fibromyalgia, and chronic insomnia. He also noted that Plaintiff was dependant on numerous medications. The doctor recommended exercise to improve the insomnia and reduce her weight. He said that he was hesitant to begin pharmacotherapy because of Plaintiff's numerous other medications. Tr. at 654. Dr. Peterson listed 12 diagnoses among which were obesity and poor physical conditioning. Among his recommendations were gentle exercise and aggressive weight reduction. Tr. at 655. On April 22, 1996, Dr. Peterson said that a new polysomnogram showed a distinct obstructive sleep apnea. The doctor prescribed Klonopin in addition to Plaintiff's other medications. Tr. at 657.

A pulmonary function test on February 9, 1996, showed a very mild restrictive defect which may have been due to marked obesity. Tr. at 646.

Doctor Pontarelli's note dated February 12, 1996, states that the previous month, during a cold spell, Plaintiff began having a reactivation of persistent S1 radicular pain. On physical exam, Plaintiff had a markedly positive straight leg raising test. Dr. Pontarelli's impression was that Plaintiff's pain was due to epidural scarring and he recommended an epidural injection. Tr. at 504. The injection was given February 19, 1996. Tr. at 857. On April 24, 1996, Dr. Pontarelli expressed concern that Plaintiff was obtaining pain medication from a number of doctors and asked her to obtain her prescriptions from only one doctor. Tr. at 505. On May 6, 1996, Dr. Pontarelli wrote that in spite of his request, Plaintiff had obtained medication from Dr. Dull. Dr. Pontarelli referred to Plaintiff's "drug seeking behavior." Tr. at 506. On May 22, 1996, Plaintiff was having pain down her right leg where there had been none before and the pain in the left leg was getting worse. Dr. Pontarelli ordered another epidural injection. Tr. at 507. This injection was given May 29, 1996. Tr. at 856. Other injections were given April 18, 1997 (Tr. at 855), July 23, 1997 (Tr. at 854), September 5, 1997 (Tr. at 853), December 26, 1997 (Tr. at 852), and January 22, 1998 (Tr. at 851).

On July 8, 1996, Dr. Pontarelli wrote a letter to Plaintiff's counsel in which he stated that Plaintiff had received only partial relief from her two back surgeries. The doctor said that Plaintiff needed to be recumbent throughout the day: "She can only be up for about two hours before she has to go down and lay down for two hours." He also said that Plaintiff can only sit for 15 to 20 minutes at a time and that "she cannot do any lifting." Tr. at 512.

On February 21, 1996, Plaintiff underwent a sleep study at Mercy Hospital in Cedar Rapids, Iowa. Tr. at 508–11. The study was interpreted as being abnormal showing sleep apnea and very poor sleep efficiency. Consideration was given to a behavioral disorder or drug side effects. Tr. at 511.

Plaintiff saw Dr. Pontarelli on December 2, 1996 because of persistent back and knee pain. Plaintiff's knee pain had been going on since the summer. On examination, the doctor noted crepitation of the lateral compartment and significant joint line tenderness. Tr. at 543. An MRI of her left knee on December 6, 1996, showed possible degenerative fraying or maceration of the medial meniscus. Tr. at 525. Also on December 6, 1996, Plaintiff had

another epidural steroid injection because of left sided leg and back pain. Tr. at 526.

On October 13, 1997, Dr. Pontarelli wrote a letter to Plaintiff's attorney in which he stated that at the time of Plaintiff's second back surgery he saw evidence of "heavy scar formation around the nerves in her back..." He said that as a result of the back pain, Plaintiff required the use of narcotic medication, and that the pain was so severe that Plaintiff was required to lay down. Tr. at 726.

On December 5, 1996, Plaintiff underwent an upper endoscopy with biopsy; colonoscopy with biopsy because she had been having protracted diarrhea and the doctor wanted to rule out celiac disease or colitis. The test was also to rule out a recurrence of colonic polyps. Tr. at 544. The biopsies showed chronic inflammation and subepithelial fibrosis consistent with chemical gastritis. Tr. at 545.

On February 1, 1997, Plaintiff underwent a psychological evaluation by Owen B. Duffy, Ph.D. Dr. Duffy performed a mental status examination and administered the Wechsler Adult Intelligence Scale—Revised (WAIS–R). He also administered a Minnesota Multiphasic Personality Inventory (MMPI). In addition, Dr. Duffy said that he reviewed medical records. Tr. at 557. On the WAIS–R, Plaintiff scored a verbal IQ of 111, a performance IQ of 98, and a full scale IQ of 105 which placed her in the high average range of intelligence. The MMPI showed that Plaintiff is a person who tends to have a poor ability to cope with the pain she experiences, and she confirmed that her experience of pain is worse when under greater distress. On Axis I, Dr. Duffy diagnosed pain disorder associated with both psychological factors and a general medical condition. Dr. Duffy did not make an Axis II diagnosis. Tr. at 559. Dr. Duffy concluded his report by observing that Plaintiff did not have symptoms consistent with a mood disorder although she may feel depressed when her pain was exacerbated. "Psychologically, her main limitation would be in learning better ways to cope with occasional distress so that her pain experience is not exacerbated to the degree it is now. However, given the fact that her coping style has been ingrained for some time, it would be very difficult to make significant changes in her ability to cope with pain at this late date." Tr. at 560. Plaintiff saw Peggy Baker, M.D. for a psychiatric examination on February 20, 1997. Tr. at 562–63. After the examination, Dr. Baker made no Axis I or Axis II diagnosis. The doctor wrote: "Ms. Gaudet may indeed have impairments that limit her ability to be an active part of the work force but these limitations are not of a psychiatric nature." Tr. at 563.

Plaintiff underwent a functional assessment at Progressive Rehabilitation Associates on September 29, 30, and October 1, 1997. Tr. at 700–08. Plaintiff also received physical therapy at this clinic in 1994, 1995, 1996 and 1997. Tr. at 760–80. Plaintiff reported that she continued to have pain "which include achiness in the left buttock radiating down to the posterior left heel, achiness in front of the left groin and in the anterior left knee, numbness in the lateral left knee and in the top of the left foot. She also has achiness in the right buttock radiating to the right knee." Aggravating activities were riding in a car for longer than 5 minutes, prolonged sitting and standing, squatting, and changes in the weather. She said that changing positions, and sitting slightly forward offered some relief. Plaintiff had undergone left knee arthroscopic surgery in December of 1996. Tr. at 700. Plaintiff's restrictions included: "No lifting, no prolonged standing, no sitting greater than 15 to 20 minutes, no twisting and no repetitive motion." On review of activities of daily living, it was noted that Plaintiff

needed help with house cleaning, carrying groceries and doing yard work. Plaintiff was on an exercise program at a fitness center doing water exercises, walking on a treadmill, exercising and using a whirlpool. Tr. at 701. The summary of the testing states that Plaintiff's functional performance was self limited due to increased low back and leg pain. There were observable changes in body mechanics which included an antalgic gait pattern, slow movements, and frequent changes in positioning. Plaintiff's ability to lift decreased each day as the testing progressed. Tr. at 704.

Gregory T. Bozek, M.D., in a handwritten note dated October 6, 1997, wrote that Plaintiff was disabled due to numerous ongoing health concerns including diabetes, hypothyroidism, asthmatic bronchitis, psoriasis, fibromyalgia, sleep apnea, and chronic back pain. The doctor noted that Plaintiff had undergone a caudal injection on September 5, 1997. Tr. at 709. See also Dr. Bozek's treatment notes. Tr. at 710–21.

On March 18, 1998, Plaintiff was seen by Leslie A. Riley, M.D. because she wanted someone other than Dr. Bozek to be her primary care provider. Dr. Riley made a list of 25 medical problems for which Plaintiff either had received medical treatment or for which she was currently receiving treatment. Among this list was morbid obesity, diabetes, rule out fibromyalgia, questionable systemic lupus, bilateral cataracts, obstructive sleep apnea, degenerative and psoriatic arthritis, and intrinsic and extrinsic asthma for which Plaintiff had required emergency treatment. Tr. at 794. Treatment notes through December 4, 1998 are in the record. Tr. at 781–94. On December 4, 1998, Dr. Riley wrote that it was very important for Plaintiff to lose weight for the sake of her diabetes and liver problem for which she was seeing a gastroenterologist. (See

Tr. at 797–99, which is a report written by Frederick Johlin, M.D., of the Pancreatico-biliaary Clinic at the University of Iowa, regarding an October 23, 1998 visit. There are additional reports from that clinic covering the period from October 15, 1997 to October 23, 1998.) Dr. Riley wrote: "She could possibly be 1 of the 25% who will result in liver injury if her wt does not change." Tr. at 782.

Plaintiff was hospitalized from January 31, to February 3, 1999, at which time she underwent a laminectomy of L3–4 and repair of a dura tear at L5. Dr. Pontarelli wrote that he had operated on Plaintiff for herniated discs twice before. Tr. at 874.

Plaintiff was treated by William L Dull, M.D. Tr. at 347–58. Dr. Dull listed 10 problems for which he saw Plaintiff: 1. Asthma; 2. Acute bronchitis; 3. Insulin dependent diabetes mellitus; 4. Dermatitis; 5. Obesity; 6. Status post surgical procedure; 7. Smoking abuse; 8. Lower abdominal pain; 9. Sinusitis; 10. Headaches. Tr. at 348.

## ADMINISTRATIVE HEARING

Plaintiff appeared and testified at a hearing on December 12, 1996. Tr. at 57–104. After the case was remanded by the Appeals Council, Plaintiff appeared at a second hearing held August 17, 1999. Tr. at 105–53. Plaintiff testified that Dr. Pontarelli continued to be her treating orthopedist. Tr. at 112. Dr. Pontarelli also appeared to testify on Plaintiff's behalf. Tr. at 117. The doctor testified that he had treated Plaintiff for 10 years after she injured her back by herniating a disc. He said that in spite of surgery, Plaintiff continued to suffer persistent back and sciatic pain. Although the pain gets worse at times, the doctor said that the pain never goes away. In addition, the doctor said that he treats Plaintiff for arthritis which is associated with psoriasis. He also arth-

roscoped her knee which showed damage to the cartilage. In addition, he said that Plaintiff has had frequent nerve blocks to get her pain down to a tolerable level. "She has never been without narcotic medication." Tr. at 118. He said that when her pain is bad, she needs a lot of medication and a lot of rest. "But she doesn't seem to be without, any day, without severe pain that causes her to need to take narcotics and lay down at least two or three times a day." He said that he operated on Plaintiff's back after a second disc herniated. He said that when he explored Plaintiff's back, it was filled with scar, which explained why she did not have relief after the first surgery. Tr. at 119. When asked if Plaintiff's impairments could be expected to cause the type of pain of which Plaintiff complains, the doctor responded: "Yes. I do examine her on these visits. And continuously, since I first met her, she's had sciatic irritation on physical exam. So it matches with what I saw through here, and what the MRI's have shown. She's had a fair number of studies over the years too, you know." The doctor responded in the affirmative when asked if there was objective evidence to support Plaintiff's complaints. The doctor said that he did not "see how she can work gainfully." Tr. at 120. In response to a question from the ALJ, the doctor stated that he had never engaged in vocational rehabilitation or job placement. Tr. at 121. The doctor said that the injections would provide about 50% relief for a month or six weeks. Tr. at 122.

After Plaintiff and her doctor had testified, the ALJ called Steven Moats to testify as a vocational expert. Tr. at 140. The ALJ asked two hypothetical questions. The first assumed a person of Plaintiff's age, education, and past relevant work experience (see Tr. at 945):

And during the period of time in question [1], she had the following impairments. She was status post laminectomies and diskectomies at the fifth lumbar and first sacral level, and fourth and fifth level of the lumbar spine with complaints of pain. She had insulin dependent diabetes mellitus. She is status post gall bladder surgery. She has asthma and allergic rhinitis, obesity, chronic skin disorder, sleep apnea and a history of psoriasis arthritis. And as a result of a combination of those impairments, she had the residual functional capacity as follows. She could not lift more than 15 to 20 pounds, routinely lift 7 to 10 pounds. With no standing of more than 30 to 60 minutes at a time. No sitting of more than 30 to 60 minutes at a time. And no walking of more than one to two blocks at a time. With no repetitive bending, stooping, twisting, squatting, kneeling, crawling, or climbing. No repetitive pushing or pulling of greater than 20 pounds. No repetitive work with the arms overhead. This individual should not—or should not have been exposed to excessive heat, humidity or cold, or more than moderate levels of dust, fumes or smoke. And she should not have worked at unprotected heights. Would this individual have been able to perform any job she previously worked at, either as she performed it, or as it was generally performed within the national economy. And if so, would you please specify which job?

Tr. at 145–46. In response, the vocational expert testified that Plaintiff could have

1. Onset of disability—October 10, 1994—through date last insured—June 30, 1998. Tr. at 34.

performed her duties as a job coach. Tr. at 146. Thereafter, the ALJ asked a second question:

And this would be an individual who could have not lifted more than five to ten pounds. With standing and/or walking of no more than 45 to 60 minutes at a time. Sitting of less than a half hour at a time. No repetitive bending, stooping, squatting, kneeling or crawling. No work which required prolonged repetitive fine manipulation or work with the arms overhead. This individual should not have been exposed to excessive cold or more than moderate levels of dust or fumes or mold. She was not able to do very complex or technical work, but was able to do more than simple routine, repetitive work which did not require constant close attention to detail. Would this individual have been able to perform any jobs she previously work at either as she performed it, or as generally performed within the national economy.

Tr. at 146–47. In response, the vocational expert said that Plaintiff would not have been able to perform her past work, but that other light and sedentary jobs would remain that she could have done. Tr. at 147–48.

## ADMINISTRATIVE DECISION

In the decision dated September 23, 1999, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time since October 10, 1994, the alleged onset of disability. The ALJ also found that Plaintiff was insured only through June 30, 1998. At the second step of the sequential evaluation, the ALJ found that Plaintiff's severe impairments are "status post laminectomies and discectomies L5/S1 and 4/5 with complaints of pain, status post gallbladder surgery, and has diabetes mellitus, asthma and allergic rhinitis, obesity, chronic skin disorder, sleep apnea and a history of psoriasis arthritis." Tr. at 34–35. The ALJ found that Plaintiff did not qualify for benefits at the third step of the sequential evaluation because none of the severe impairments meet or equal any listed in Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4. At the fourth step, the ALJ found that Plaintiff is able do her past relevant work as a job coach and, therefore, not disabled. In making this finding, the ALJ found that Plaintiff has a residual functional capacity consistent with his first hypothetical question. He also found that Plaintiff's complaints of pain are not supported by the record as a whole and are not credible. He found that while Dr. Pontarelli's testimony was credible (although, as will be shown below, the ALJ also wrote that the doctor's testimony was not credible), his opinions were not given significant weight. Tr. at 35. In regard to why he did not give significant weight to Dr. Pontarelli's opinion, the ALJ wrote:

On July 8, 1996, Dr. Pontarelli reported that the claimant required frequent doses of analgesics for pain. He said she reclined throughout the day a number of times. He said she could be up for about two hours before needing to lie down for two hours. He said her sitting tolerances was 15 to 20 minutes, and her standing tolerance was two hours. He said she could travel in a car for only five miles. He said she could not do any lifting. He said she was unemployable due to her need to lie down. The opinion of a treating physician, if it is well supported and not inconsistent with the other substantial evidence in the case record is entitled to controlling weight. (20 CFR 404.1527(d)(2) and SSR 96–2p). The undersigned finds that Dr. Pontarelli's opinion of July 8, 1996, is not supported by his own medical records. This opinion seems to be

based, not on Dr. Pontarelli's observations and medical judgment but rather on the claimant's own allegations. Furthermore, the claimant testified that she can drive 10 to 15 miles, which is inconsistent with what Dr. Pontarelli said. Similar analysis applies to other opinions of Dr. Pontarelli in the record. (For example, Exhibit 90 [Tr. at 726, a report dated October 13, 1997 in which he mentioned his observations of scar formation around the nerves in Plaintiff's back which caused the need for daily narcotic medication and the need to frequently lie down]). In addition, the issue of whether a condition is "disabling" or whether she is "employable" is reserved to the undersigned and a physician's opinion is not dispositive. (20 CFR 404.1527(e) and SSR 96–5p). The undersigned finds that Dr. Pontarelli's opinion is not credible and is not worthy of controlling weight. Similar analysis applies to Dr. Pontarelli's opinions given at the second hearing.

Tr. at 31. It was the ALJ's decision that Plaintiff is not disabled and not entitled to the benefits for which she had applied.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,*

87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

In the opinion of the Court, the ALJ's credibility analysis of the claimant and her physician falls far short of what is required by the Social Security Act, the regulations, and by 8th Circuit case law on the subject. Credibility is a subject that has been addressed in several very recent cases. For example, in *O'Donnell v. Barnhart,* 318 F.3d 811, 816–17 (8th Cir. February 7, 2003), the Court wrote:

It is well-settled that an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them. *Jones v. Callahan,* 122 F.3d 1148, 1151 (8th Cir.1997)(*Jones*). In evaluating a claimant's allegations, in addition to the objective medical evidence, an ALJ must consider a claimant's "prior work history; daily activities; duration, frequency and intensity of the pain; dosage, effectiveness and side effects of medications; precipitating and aggravating factors; and functional restrictions." *Bowman[ v. Barnhart],* 310 F.3d [1080] at [1]083 [(8th Cir.2002)] (Internal quotation omitted; citing *Polaski [v. Heckler,* 739 F.2d 1320 (8th Cir. 1984)]). The ALJ must also consider "observations by third parties." *Jones,* 122 F.3d at 1151. As O'Donnell notes,

there is objective medical evidence supporting, at least some of, her allegations of pain. For example, a 1997 MRI examination at the Mayo Clinic showed "[a]dvanced degenerative spondlotic changes" in her cervical spine with impingement on her spinal cord.

In the case at bar, Dr. Pontarelli, who had treated Plaintiff for 10 years prior to the date of the hearing, pointed to the scar tissue that had grown around Plaintiff's spinal nerves as objective evidence in support of her complaints of pain. He also pointed to the objective findings from the diagnostic tests he performed during his examinations, and to MRI of which the doctor said Plaintiff had "a fair number." Furthermore, Plaintiff was prescribed narcotic medication which she needed to take every day. This too is evidence of pain. This is not a case where a treating physician offers a one-line conclusory statement that the patient is disabled with no support whatsoever in the treatment notes. Here, we have the live testimony of a highly qualified treating physician who has performed three surgeries on Plaintiff's back as well as a surgical procedure on one of her knees. He prescribes her medication, and sees her for clinical examinations frequently. To discredit the doctor's testimony for an insignificant discrepancy in how far Plaintiff can drive is, quite frankly, incomprehensible. In *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir.2001), the Court wrote: "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give good reasons for that weighting." Citations omitted. In *Holmstrom*, the physician's opinion was given in a check list form, was based on a relatively short term treatment relationship, and was inconsistent with other medical evidence in

the record. *Id.* at 720–21. Here, the opposite is true. The doctor appeared at a hearing where he could be questioned by Plaintiff's counsel and by the ALJ. His testimony was consistent with both his treatment notes, and opinion letters. His opinion was based on his observations both in his office and during surgery. It was also based on the numerous MRI's and other diagnostic tests. In this case, the ALJ failed to give good reasons for discounting Dr. Pontarelli's medical opinion regarding Plaintiff's residual functional capacity.

During the functional capacity assessment in September and October of 1997, Plaintiff's ability to function deteriorated as the test day continued. Likewise, the notations made during Plaintiff's work as a job coach indicate that while Plaintiff was trying to do a good job, she was not able to work full time.

In addition to Dr. Pontarelli's frequently expressed opinion that Plaintiff was disabled, Dr. Bozek opined that Plaintiff was disabled because of the multiple conditions for which he was treating Plaintiff.

In *Osborne v. Barnhart*, 316 F.3d 809 (8th Cir.2003), the Court upheld an ALJ's finding that the claimant was not credible in part because she had not sought medical care for her complaints. In *Curran–Kicksey v. Barnhart*, 315 F.3d 964 (8th Cir.2003) the claimant's testimony was discredited because there was a lack of supporting medical evidence; because the degenerative changes resulting from an accident had been present for a long period of time during which time the claimant had worked; the claimant's doctors had never told her she was disabled and, in fact, told her that she could work; the claimant had not taken prescription medication for a year before the hearing; the claimant's complaints that she needed to lie down had not been made to her

doctors, and the doctors had told her not to take naps during the day; a treating physician wrote that during examinations, the claimant had histrionically moaned, jumped and grimaced, leading to the conclusion that she was overstating her complaints. None of these reasons for discounting a claimant's testimony apply in this case. The ALJ's finding that Plaintiff's testimony and the testimony of Dr. Pontarelli is not credible is not supported by substantial evidence on the record as a whole.

Likewise, the Court finds no evidence to support the ALJ's finding that Plaintiff has a residual functional capacity to engage in her past relevant work. While Plaintiff made a valiant effort to work after her first surgery, she re-injured her back and, after her alleged onset of disability, underwent two more back surgeries. The Court of Appeals has held numerous times that although the ALJ bears the responsibility to determine residual functional capacity based on all the evidence, it is a medical question and must be supported by some medical evidence. *Krogmeier v. Barnhart,* 294 F.3d 1019, 1023–24 (8th Cir.2002) and cases cited therein. The Court has searched the record in an attempt to find some medical evidence in support of the ALJ's residual functional capacity finding to no avail.

In *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987), the Court wrote:

Ordinarily, where the Secretary has incorrectly allocated the burden of proof based on an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

In *Seavey v. Barnhart,* 276 F.3d 1, 11–12 (1st Cir.2001), Plaintiff argued that he should be awarded benefits because the Commissioner had not met her burden of proof with vocational expert testimony and she should not be given another opportunity to do so. The Court found that such an approach was inconsistent with the dictates of 42 U.S.C. § 405(g) and with the approach generally taken when reviewing administrative actions. Rather, wrote Judge Lynch:

[I]f the evidence and law compelled one conclusion or the other, then the court could order an award of benefits or affirm a denial of benefits. For example, a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence. (Citation omitted) Similarly, if correcting the legal error clarified the record sufficiently that an award or denial of benefits was the clear outcome, then the court may order or affirm denial. Conversely, if an essential factual issue has not been resolved, as here, and there is no clear entitlement to benefits, the court must remand for further proceedings. A number of circuits appear to have adopted this view.

In the case at bar, the evidence compels only one conclusion, Plaintiff was disabled during the time that she was insured for benefits and there is no evidence in this record that Plaintiff's medical condition is improved in any way.

Plaintiff has come forward with overwhelming medical evidence that she is unable to do any of her past relevant work, as well as any other work that exists in the national economy. A remand for further proceedings would only delay the receipt of the benefits to which Plaintiff is entitled. Furthermore, this case has already been the subject of two administrative hearings,

one of which resulted in testimony from the treating physician. The record is as developed as is possible. The evidence is overwhelmingly one sided in Plaintiff's favor. *See Tennant v. Schweiker,* 682 F.2d 707, 710 (8th Cir.1982)("The record has been fully developed, and the overwhelming weight of the evidence supports Tennant's claim.") The case, therefore, is reversed with an order to award benefits.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).

IT IS SO ORDERED.