Teresa L. GRAHAM, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. 4:10–cv–215 RP–RAW.

United States District Court, S.D. Iowa, Central Division.

Jan. 3, 2012.

---

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

Thomas A. Krause, Attorney at Law, Des Moines, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Plaintiff, Teresa L. Graham, filed a Complaint in this Court on May 12, 2010, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

On January 13, 2011, the Commissioner moved for a remand under Sentence 6, for the purpose of locating the record of the case. Clerk's 5. The Motion was granted. Clerk's 7. On February 11, 2011, the Commissioner moved to reopen the case. Clerk's 9. The case was, thereafter, briefed by both Plaintiff and Defendant, and the matter is now fully submitted.

Plaintiff filed applications for benefits February 9, 2005. Tr. at 129–33. The alleged onset of disability is August 21, 2003. Tr. at 129. Plaintiff, whose date of birth is October 17, 1959 (Tr. at 129), was 47 years old at the time of the hearing on April 16, 2007, before Administrative Law Judge George Gaffaney (ALJ). Tr. at 68–107. The ALJ issued a Notice Of Decision—Unfavorable on September 19, 2007. Tr. at 11–26. The Appeals Council declined to review the ALJ's decision on March 17, 2010. Tr. at 5–9. Thereafter, Plaintiff commenced this action.

As a preliminary matter, the ALJ found Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2006. At the first step of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity at anytime between the alleged onset date and the date last insured. At the second step, the ALJ found Plaintiff has the following severe impairments: degenerative disc disease of the cervical spine, status post discectomy and laminectomy with fusion in 1996; fibromyalgia; migraines; right shoulder pain/osteoarthritis; nonsevere low back pain, bilateral carpal tunnel, heal pain; and, adjustment disorder. Tr. at 16. The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 17. At the fourth step, that ALJ found:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work except for lifting more than 20 pounds occasionally and 10 pounds frequently. She can stand 30 minutes at a time for at least six hours of an eight hour workday. She can occasionally climb stairs, ladders, balance, stoop, kneel, crouch, and crawl. She can frequently perform handling with her right upper extremity. She can do more than simple, routine work, but not complex work. She may miss one day pf work per month due to impairments in combination.

Tr. at 18. The ALJ found that during her insured period, Plaintiff was unable to perform any of her past relevant work. At the fifth step, the ALJ found that through the date last insured, Plaintiff was able to do a significant number of jobs. Tr. at 24. The ALJ relied on the testimony of a vocational expert finding that examples of jobs within Plaintiff's residual functional capacity included final assembler, charge account clerk, and surveillance system monitor. Tr. at 25. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 26.

## MEDICAL EVIDENCE

On August 21, 2003, Plaintiff was seen at the Emergency Department at Iowa Methodist Medical Center after she had been rear ended while in a stopped vehicle. Tr. at 191. X-rays of Plaintiff's lumbosacral spine showed mild degenerative changes at L2–3. Tr. at 200. X-rays of the cervical spine, did not show any fracture or abnormal bony alignment. A fusion at C5–6 was seen. Tr. at 198, See also report of an MRI dated August 30, 2003 at Tr. at 204–05. A chest x-ray did not show any acute disease. Tr. at 196. Plaintiff arrived at the hospital at 2:50 p.m. (Tr. at 191), and she was discharged home with prescriptions at 4:30 p.m. Tr. at 191. The admission form notes that Plaintiff had a C4/C5 fusion "7 yrs. ago." Tr. at 191. Plaintiff returned to the hospital on August 29, complaining of a headache that would not go away. On this form, the year of her cervical fusion was noted to be 1997. Plaintiff's medications were Vicodin and a muscle relaxant. Tr. at 185. Plaintiff was given injections after which she reported relief and she was discharged home. Tr. at 186.

On September 15, 2003, Plaintiff saw Daniel J. McGuire, M.D. Dr. McGuire wrote that he performed the Anterior Cervical Fusion. Plaintiff told the doctor that since the car accident she had been miserable with her neck and arms bothering her. Plaintiff also complained of pain throughout the lower back region and into the buttocks. Plaintiff said she had minimal lower extremity complaints, but that she was not able to sleep well. After a physical examination (Tr. at 206), Dr. McGuire opined that Plaintiff probably had suffered a significant whiplash type injury. He wrote that it was very common to have carpal and cubital tunnel symptoms with whiplash. The doctor explained to Plaintiff that she could expect to be bothered by her symptoms for a minimum of 3 to 6 months during which time she would experience both improvement and worsening. He did not think Plaintiff would require any more surgery, but he encouraged her to engage in a regular exercise program. Tr. at 207.

On October 1, 2003, Plaintiff was given a prescription for physical therapy, three times a week for 4 weeks. Tr. at 231. Plaintiff attended physical therapy from October 13, through November 11, 2003. Tr. at 208 to 230.

On February 16, 2004, Plaintiff saw Manali Barua, M.D. at the University of Iowa Hospitals and Clinics. Plaintiff reported that after the accident of August 21, she had worsening of numbness and tingling in her right hand along with new numbness and tingling in the left hand. She also had worsening of neck pain, especially with turning of her neck to either side. Although she experienced low back pain, she told Dr. Barua that she was more concerned about the problems in her neck. After a physical examination (Tr. at 251), the doctor ordered a bone scan of Plaintiff's cervical spine. If that test was negative, he said he would get nerve conduction studies and possibly a CT myelogram of the cervical spine. Tr. at 252.

On February 23, 2004, Plaintiff underwent the bone scan and saw Dr. Barua.

The bone scan showed "an increased uptake at C5–6 which is likely secondary to postsurgical changes but a fracture cannot be ruled out." The doctor ordered a CT myelogram to see if there was compression at the C5–6 level. Tr. at 248. Plaintiff underwent the myelogram on March 8, 2004. Tr. at 245–47. Plaintiff experienced a post myelogram headache for which she was treated by William D. Hammonds on March 10, 2004. Tr. at 243–44.

On March 29, 2004, Plaintiff saw Dr. Barua who explained that the myelogram showed a posterior bone spur and some deformation of the spinal cord at the C5–6 level. The CT did not reveal any evidence of fractures. Dr. Barua and Plaintiff agreed that it would be prudent for her to reduce the narcotic medication, and to that end, he said he would refer her to the Regional Pain Center. Tr. at 241.

On April 22, 2004, Plaintiff was seen at the chronic pain clinic at the University of Iowa Hospitals and Clinics under the care of Naeem Haider, M.D. It was noted that Plaintiff recently tapered off OxyContin but was still taking Percocet Neurontin and Ibuprofen. Tr. at 238. After the review of history and a physical examination, Dr. Haider diagnosed chronic neck pain status post C5–6 fusion, and myofascial pain primarily of the trapezius. Plaintiff was instructed to increase the Neurontin, add Nortriptyline, continue ibuprofen and she was given a prescription for tramadol. Plaintiff was urged to quit smoking. She was also advised to continue doing the exercises she had been shown in physical therapy to increase range of motion and strength. Tr. at 239.

On April 26, 2004, Plaintiff saw Dr. Barua. Although Plaintiff had not noticed improvement in her pain level, it was noted that it had been less than a week that she began that treatment. Dr. Barua advised Plaintiff to continue with the treatment plan of the pain clinic, and to in-

crease her activity level. The doctor also told Plaintiff that she would likely have chronic neck pain that would fluctuate in severity, and that the paresthesias in her hands may never resolve. Tr. at 236.

Plaintiff saw Dr. Haider on June 29, 2004. Tr. at 234. Plaintiff's medications were renewed and the dosage increased, and Baclofen was added. Tr. at 235.

On July 19, 2004, Plaintiff saw Christopher J. Berry, M.D. in the spine clinic where Plaintiff usually saw Dr. Barua. Plaintiff reported there had been no improvement in her neck and bilateral upper extremity pain. Plaintiff said she had complete numbness in her hands. On physical examination, however, sensory examination was intact to light touch, vibration and pinprick with the exception of the right index finger which demonstrated some mild hypalgesia. Dr. Barry recommended a consultation in the Disability Evaluation Clinic. Tr. at 232.

On July 21, 2004, Plaintiff underwent an independent medical examination by John D. Kuhnlein, D.O. Tr. at 254–65. Under the heading, Current Symptoms, The doctor wrote:

> Ms. Graham describes pain near the sternocleidomastoids bilaterally, and posteriorly that radiates to the right arm to the right first through third digits. She described radiation of her pain down the left arm to her entire hand. She states that she gets a burning sensation from approximately the L1 area radiating upward towards the cervical spine. She states that she feels like her neck does not want to support her head. Her husband relates that if he pinches the trapezius muscle it relieves some her symptoms on a short-term basis. He also relates that her pain is so severe, that on occasion he awakens at night and notices that she is crying because of her discomfort. Coughing and sneezing

increases her neck pain, producing an electrical sensation from her neck into her arms. She states a Valsalva maneuver increases her neck pain and gives her a headache.

She also describes occasional low back pain that radiates towards the right buttock, and sometimes to the right fifth toe. She is able to control her bowels and bladder. She denies pain at the tip of her tailbone or entire leg numbness; although she states that the whole leg can become numb and does give way. She describes headaches that begin in the occipital area radiating forward to her temples. She states that when this occurs she goes to a dark room and lies down and closes the door. She states that on occasion she has nausea associated with her headaches, and goes to bed when she has such headaches. The pain ranges between 4 and 10 on a scale of 10 and is usually 6–7/10.

Tr. at 257–58. After a physical examination (Tr. at 260–62), Dr. Kuhnlein summarized his findings as: 1) Pre-existing cervical spine injury, November 25, 1996, which resulted in the C5–6 discectomy and fusion on January 14, 1997; 2) headaches which increased in severity, and appeared to be migraine equivalent; 3) low back pain with some radicular features; 4) "Significant psychosocial factors. She appears to be more sensitive to pain than most, as ha been shown in the past medical record."; 5) lumbar spine injury February 26, 1999 with the MRI scan showing mild degenerative disc disease without evidence of disc protusion or extrusion; 6) motorvehicle accident on August 21, 2003. Tr. at 262. The doctor opined that prognosis was poor for symptom resolution, and for return to work either unrestricted or with appropriate accommodations. Tr. at 263. Under the heading Restrictions, the doctor wrote: "At this time, based on the physical examination, I do not think that Ms. Graham would be successful in any return to the workplace. I believe that it would be important to have her chronic pain under better control where she is controlling the pain rather than having the pain control her." Tr. at 264.

Plaintiff was hospitalized for treatment of pneumonia from November 12 to 16, 2004, at Iowa Lutheran Hospital. Tr. at 266–70.

On May 3, 2005, Plaintiff was seen for a psychological evaluation by Philip L. Ascheman, Ph.D. Tr. at 271–74. For his review, Dr. Ascheman was provided Dr. Kuhnlein's report and a single note from the Eidbo clinic dated December 23, 2004. At the beginning of his report, Dr. Ascheman noted that Plaintiff appeared to be depressed, and he referenced Dr. Kuhnlein's remark that Plaintiff's had significant psychosocial factors and appeared more sensitive to pain than most. Dr. Ascheman also noted that Plaintiff's thought processes were clear and well organized and that she did not show evidence of destructibility while displaying pain or emotional reactivity. Plaintiff produced bottles of pills she was taking, including Prozac and Zanax. Based on the pills remaining, it appeared to Dr. Ascheman that Plaintiff was taking less than the full dosage prescribed. Among her symptoms, Plaintiff reported that when she's around people, she feels enclosed. Tr. at 271. She reported anxiety symptoms that come only when she tries to leave the house because she is afraid she will fall or drop something. Plaintiff told the psychologist that her activities consist of doing dishes, folding clothes, and taking naps. For enjoyment, she said she plays card games and dominoes. Tr. at 272. She said that she has 15 grandchildren and sees some of them every day either at her home or theirs. "She also enjoys watching her son play baseball and she talks to friends on the phone. She occasionally

meets trucker friends at the truck stop when they are passing through town. She enjoys going out with girlfriends and sitting and talking." On brief mental status testing, Plaintiff showed intact orientation in all spheres. Short term memory, concentration and attention were all intact. Dr. Ascheman opined that Plaintiff's presentation was consistent with a diagnosis of adjustment disorder with mixed depression and anxiety. He said her symptoms were precipitated by pain. Plaintiff's reported fear of going out in public was inconsistent with her reported activities. He also noted that Plaintiff was taking medication on an inconsistent basis at below the prescribed dosages. Tr. at 273. Dr. Ascheman concluded his report by noting that Plaintiff's concentration and attention may be variable with her level of pain. He went on:

> Overall, I would rate her concentration as up to moderately limited, at times. This would not preclude her from engaging in simple cognitive tasks, and the majority of the time, she would be expected to be able to engage in detailed and complex mental tasks, as well.
>
> Her judgment is intact and her activities of daily living would suggest no more than mild difficulty in interacting with the general public. There would not appear to be any limitations with interacting with supervisors or co-workers who would presumably be well known to her. She is capable of managing her own funds.

Tr. at 273–74.

On June 1, 2005, Plaintiff saw Robert C. Winchell, D.O. for a consultative physical examination. Dr. Winchell noted that no medical records were available for his review. Tr. 275. Plaintiff's medication list was: Prozac, alprazolam (a medication Plaintiff uses for anxiety, see Tr. at 365), Methadone and Ambien. On physical examination, Plaintiff "was quite tearful and seemed to be emotionally upset." Tr. at 276. After the physical examination (276–77 and 278–79), Dr. Winchell, again noting that his opinion was based only on his examination of that day and his interview with Plaintiff, wrote:

> ... based upon history and physical exam today, there is no evidence of any radiculopathy. Patient made no mention of any headaches at the time of history taking today. I would estimate that the patient should be able to lift and carry at least 20 to 25 pounds on an occasional basis and 10 to 12 pounds more frequently in an eight hour day. Given an opportunity for occasional variation, I see no problem with standing, moving about, walking or sitting in an eight hour day. Although, perhaps stooping, climbing, kneeling or crawling can not be done on a frequent repetitive basis, I see no problem with these activities occasionally. I see no limitation in handling objects, seeing, hearing, speaking or traveling. Within reason, I see no limitation in the work environment in terms of dust, fumes, temperature changes or other hazards. In short, with the information available to review at this time, I feel that the patient can be gainfully employed. Should she feel that because of back problems she can not be engaged in heavier type activity, I would suggest she seek employment in a lighter type work.

Tr. at 277.

Hand written treatment notes from the Eidbo Clinic in Des Moines, Iowa are found at Tr. at 280–319 and 343–46. These treatment notes cover the period from December 2003 through March 7, 2006. Although the Court has reviewed each page of the treatment notes, they are often difficult to read and no purpose would be served by attempting to summarize them page by page.

On March 20, 2006, Plaintiff was seen at the Iowa Pain Management Clinic by John F. Peppin, D.O. Tr. at 364–72. Plaintiff presented with complaints of headaches, neck and right arm pain, low back and left leg pain, heel and right foot pain as well as numbness and tingling of the hands. Plaintiff's history includes a notation that she sees Dr. Joan Clue (psychiatrist) as well as Dr. Rick Douglas. Dr. Douglas' records will be noted in treatment records from the Veterans Administration Medical Center. Plaintiff described her headaches as very sharp—"It's like 'the top of my head is going to explode.'" Plaintiff said that the neck pain had been continuous since the car accident. She said she has numbness and tingling in all five fingers of the right hand. She said she can no longer carry a bag of potatoes or a gallon of milk. Plaintiff also described numbness and tingling of the first and second fingers of the left hand. Tr. at 364. Plaintiff said the low back pain was continuous and that it radiated down into the buttocks, down to the right foot where she experienced numbness and tingling. Tr. at 365. Plaintiff's medication consisted of OxyContin, Oxycodone, Duloxentine, Alprazolam, Cephalexin, Docusate sodium, Ibuprofen and suppositories for nausea. Tr. at 366. On review of systems, Plaintiff reported that she had seen a psychologist at the University of Iowa and Robert Straight, Ph.D. in Des Moines. Tr. at 367. On physical examination (Tr. at 368–70), the doctor tested for fibromyalgia using American Rheumatological Association criteria on which Plaintiff scored 14 out of 18. Tr. at 369. After the physical examination, Dr. Peppin listed 25 medical problems and plans to address them. Tr. at 370–72. The first five notations address Plaintiff's headaches and treatment options.

Plaintiff was seen at the Veterans Administration Medical Center in Des Moines (the VA). Tr. at 374–429. The records are poorly arranged, but the first notation

of treatment seems to be August 18, 2006, at which time Plaintiff expressed concern that she was sleeping too much. The most likely reason was thought to be Plaintiff's usage of morphine and methadone, prescribed by her non-VA physician. Tr. at 407.

On January 16, 2007, Plaintiff saw Thomas D. Hansen, M.D. at the VA. The Doctor noted that Plaintiff had been weaned off methadone, after which she felt significantly worse. Tr. at 428. On examination, Plaintiff had pain on abduction of the right shoulder. Sensation was intact in the upper extremities, but decreased to light touch in the lower extremities in an S1 pattern. Dr. Hansen's opinion was that Plaintiff had a rotator cuff tear and stenosis at C5–6. He referred her to an orthopaedist for evaluation of the rotator cuff tear, and he increased the dosage of methadone. The doctor also referred Plaintiff for a surgical consultation in Omaha, Nebraska. Tr. at 429.

Plaintiff was seen at the VA on February 21, 2007, by orthopedic surgeon Allen G. Lang for her right shoulder pain. Tr. at 412. Although Plaintiff had undergone an MRI, it was not available for Dr. Lang's review. After a physical examination, Dr. Lang injected the subacromial space "as much for diagnostic purposes as anything else." On March 1, 2007, Dr. Lang reviewed the MRI which showed a cyst in the subchondral area of the humeral head. The doctor opined that was unlikely to be causing her symptoms, so he recommended a neurosurgical evaluation. Tr. at 413. A note signed by Neurologist Steven R. Adelman on February 22, 2007, states that nerve conduction studies and EMG on the right upper extremity were normal. Tr. at 415.

On April 3, 2007, Dr. Hansen along with a physician's assistant, filled out a functional capacity assessment form. Tr. at

430–33. The form is addressed to Dr. Fredrick Bahls. Tr. at 430 The doctor opined that because of sedation, Plaintiff was incapable of even low stress jobs. The doctor opined: Plaintiff can walk 1 city block (Tr. at 431); sit for 15 minutes; stand for 10 minutes; sit/stand walk less than 2 hours of an 8 hour work day; be able to walk around for 4–5 minutes every 10 minutes during a work day; be able to take unscheduled breaks every 30 minutes for 5 minutes at a time; occasionally lift 10 pounds (Tr. at 432); never look down or up, or turn head to right or left; frequently hold head in a static position; rarely twist, stoop (bend), crouch/squat, climb ladders, or climb stairs; Plaintiff has significant limitations with reaching, handling and fingering. The doctor opined that Plaintiff would be absent from work more than four days per month.

### HEARING TESTIMONY & VOCATIONAL EXPERT

At the hearing, when asked why she could not work, Plaintiff responded: "The pain. I can't—I don't have the use of my right hand and some of my left. I've got—I can't sit and drive a truck." Plaintiff said the pain comes out of her neck, into her right arm, and a little into the left arm. She said she has pain in her lower back into her legs, and that she gets terrible migraines. Tr. at 81. She said that her hands don't work right, and as an example, she said she broke two glasses the day before the hearing. She said she had constant pain in her low back and into her right foot. Tr. at 82. She testified: "I have constant pain coming out of my lower back down into my right foot down through my buttocks. When I walk the only time I get relief is really is when I lay down." When asked to talk about the pain in her neck, she said: "There's pain coming out of my shoulders, out of my neck down into my shoulders into the mid to the upper back and down into my arm. It's electrical shocks and pins and needles. It's constant, it doesn't go away." Tr. at 83. Plaintiff testified that she has headaches at least twice a week, and often they are severe enough they cause her to vomit. She said sometimes the medication helps and sometimes it doesn't. Tr. at 84.

Plaintiff said the medication prescribed for her makes her very tired. She said the doctors tried to take her off Methadone, but they put her back on it to control the pain. Tr. at 85.

Plaintiff testified that because of depression, "I cry all the time. I don't want to be around people.... They just make me very nervous." Tr. at 86.

Plaintiff testified that she can sit between five and fifteen minutes, after which: "... like right now, I've got shooting pains down into my leg that hurt so bad." She said that standing relieves the pain a little, but walking does not help. When asked about lifting, Plaintiff said she can lift a gallon of milk with her left hand. Tr. at 88.

When asked about daily activities, Plaintiff said she tires to do a little bit of laundry. Tr. at 89. She said her son and daughter take care of things like dusting. She said that driving hurts her so she does not do it much. Tr. at 90.

After Plaintiff testified, the ALJ called Elizabeth Albrecht to testify as a vocational expert. Tr. at 90. The ALJ asked the vocational expert to consider an individual who was 47 years old, 44 years old at the alleged onset date with a year of college and past relevant work as set forth at page 184 of this record. Tr. at 100. Thereafter, the ALJ asked the vocational expert a series of hypothetical questions:

The first one, limit lifting to 20 pounds occasionally, 20 pounds frequent lifting. Stand and sit six hours each in an eight

hour workday. All the non exertional I'm going to make occasional. And the handling frequent with the right hand rather than constant. I'm going to limit to semi-skilled here looking at the combination of the pain, and meds, and the depression. And miss one day a month from work.

In response, the vocational expert testified that such a person could do Plaintiff's past work as a semi-truck driver. as she performed the work. Next, the ALJ limited standing and sitting to 30 minutes each time which, according to the vocational expert limited the hypothetical person to sedentary work. The vocational expert testified that Plaintiff's skills would not transfer to sedentary jobs. Tr. at 101. Examples of sedentary unskilled work were final assembler, charge account clerk and surveillance system monitor.

Finally, the vocational expert was asked to assume that the hypothetical person would not be able to sustain an eight hour work day, which she testified would preclude all competitive employment. Tr. at 102.

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue,* 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart,* 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue,* 528 F.3d 1113, 1115 (8th Cir.2008). The decision

of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola [v. Astrue],* 480 F.3d [885] at 886 [ (2007) ]). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir.2005).

*Owen v. Astrue,* 551 F.3d 792, 798 (8th Cir.2008.) In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

In *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc), the Court wrote: "Probably the most important issue will be the question of RFC ..." The Court went on: "The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." While an ALJ is charged with determining a residual functional capacity based on all the evidence, it is a medical question and must be supported by some medical evidence. *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir.2001). Additionally, a credibility finding cannot substitute for medical evidence to support a finding that a claimant has a residual functional capacity to work. *Soth v. Shalala,* 827 F.Supp. 1415, 1417 (S.D.Iowa 1993).

The evidence in this record, summarized above, shows that Plaintiff was injured in an automobile accident on August 21, 2003.

Daniel J. McGuire, M.D., who had previously performed a cervical fusion surgery on Plaintiff, opined that she had suffered a significant whiplash injury which accounted for her symptoms, including symptoms of carpal and cubital tunnel. In February 2004, Plaintiff sought treatment at the University of Iowa Hospitals and Clinics where she complained of worsening numbness and tingling in her right hand, left hand, and neck pain. At the University, Plaintiff underwent a bone scan and a myelogram. Plaintiff was prescribed Oxy-Contin, Percocet, Neurontin, Ibuprofen, Nortriptyline, Tramadol, and Baclofen. She received treatment at the pain clinic.

After an extensive review of the available medical records, and a detailed physical examination, John D. Kuhnlein, D.O., opined that prognosis was poor for a resolution of Plaintiff's symptoms, and for a return to any kind of work.

Psychologist Philip L. Ascheman, Ph.D., opined that Plaintiff was depressed, but that the depression would not preclude simple cognitive tasks, "and the majority of time, she would be expected to be able to engage in detailed and complex mental tasks."

When Plaintiff saw Robert C. Winchell, D.O., he reported he had been provided with no medical records for review, and emphasized that his opinion was based solely on his examination that day and what Plaintiff told him. Plaintiff's medications included Prozac, alprazolam, Methadone and Ambien. He observed that she was quite tearful and emotionally upset. Dr. Winchell opined Plaintiff could be gainfully employed, being able to lift and carry 20 to 25 pounds occasionally and 10 to 12 pounds more frequently. He opined that with occasional variation, Plaintiff could sit, stand, and walk during a work day.

When Plaintiff saw John F. Peppin, D.O., she was complaining of headaches, neck and right arm pain, and low back and left leg pain heel and right foot pain, and numbness and tingling of her hands. Plaintiff said the headaches were so severe that it felt as if the top of her head was going to explode. Plaintiff was seeing doctors at the Veterans Administration Medical Center, including psychologists and psychiatrists. Her medication included OxyContin, Oxycodone, Duloxentine, Alprazolam, Cephalexin, Docusate sodium, Ibuprofen and suppositories for nausea. Dr. Peppin tested Plaintiff for fibromyalgia using the American Rheumatological Association criteria, his diagnoses included this disease. He diagnosed migraine headaches, tension headaches, chronic daily headaches, transformed migraine [1], and a component of traumatic migraines.

Dr. Hansen, one of Plaintiff's treating physicians at the Veterans Administration Medical Center, opined that Plaintiff was unable to work because of sedation. He

---

1. Transformed migraine (TM) is a migraine condition that initially began as episodic migraine attacks, which then increase in frequency over a period of month to years. Transformed migraines occur daily or almost daily and appear to be a mixture of tension type headaches and migraine attacks. The pain associated with transformed migraines often drops to a mild to moderate level of severity. Patients with TM often have a history of episodic migraines originating in the early teens or twenties. The process of transformation yields attacks that are frequently accompanied by phonophobia, photophobia, and nausea, but these symptoms tend to lessen in severity and frequency over time. Many other symptoms of migraine remain, such as unilateral pain, gastrointestinal symptoms, as well as aggravation by other triggers. Many of the patients with TM are women, 90% of whom have a history of migraine without aura. Web site of the National Headache Foundation. http://www.headaches.org/education/Headache_Topic_Sheets/Transformed_Migraine

wrote that she would be able to lift only 10 pounds occasionally, sit and stand for less than 2 hours in an 8 hour work day. He also opined that Plaintiff would be absent from work more than four days per month.

In *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987), then Chief Judge Lay, writing for the Court and discussing the substantial evidence on the record as a whole test, wrote:

> In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. National Labor Relations Bd.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory. *see Steadman v. Securities and Exchange Commission*, 450 U.S. 91, 99, 101 S.Ct. 999, 1006, 67 L.Ed.2d 69 (1981). It follows that the only way a reviewing court can determine if the entire record was taken into consideration is for the district court to evaluate in detail the evidence it used in making it's decision and how any contradictory evidence balances out.

There is some evidence which supports the Commissioner's final decision, namely, the opinions of Dr. Winchell and Dr. Ascheman. All of the other medical evidence, however, detracts from the Commissioner's decision, and these two pieces of evidence are not substantial. In *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir.2003), the Court wrote:

> We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision. *See, e.g. Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir.1999)(stating that the opinion of a consultative physician

does not generally satisfy the substantial evidence requirement). This is especially true when the consultative physician is the only examining doctor to contradict the treating physician. *Id.*

Plaintiff consistently sought medical treatment for her impairments which stem directly from the injury she sustained on the alleged onset of disability. Consistent diagnosis of chronic pain, along with a long history of pain management and drug therapy is objective medical evidence supporting a claim for disability benefits. *See O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th Cir.2003), *citing Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir.1998). She has been evaluated with several medical tests and treated with narcotic medication. Both treating and examining physicians have opined that she is unable to work. In the opinion of the Court, the weight of the evidence detracts from the weight of the evidence supporting that decision.

Plaintiff has proven her case with medical evidence and the Court finds no need to remand for any reason other than to determine the amount of her past due benefits. "... [W]here the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand." *Gavin v. Heckler*, 811 F.2d at 1201.

## CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing text noted in *Gavin v. Heckler*, 811 F.2d at 1199 (8th Cir.1987), and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a

whole. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[2]. *See also, Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart*, 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

[2]. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."